Abu Bakker Qassim, et al. vs.  George W. Bush, et al.　　　　　CV 05-497　　　　　August 25, 2005

Page 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ABU BAKKER QASSIM, et          :     Civil Action No. 05-497
al.,                           :
          Plaintiffs,          :     August 25, 2005
v.                             :
GEORGE BUSH, et al.,           :
          Defendants           :     2:00 p.m.
. . . . . . . . . . . . . :  . . . . . . . . . . . . . .

TRANSCRIPT OF STATUS CONFERENCE
BEFORE THE HONORABLE JAMES ROBERTSON
UNITED STATES DISTRICT JUDGE

APPEARANCES:
For the Plaintiffs:       P. SABIN WILLETT, ESQUIRE
                          BINGHAM McCUTCHEN, LLP
                          150 Federal Street
                          Boston, Massachusetts  02110-1726
                          (617) 951-8684


                          SUSAN BAKER MANNING, ESQUIRE
                          BINGHAM McCUTCHEN, LLP
                          1120 20th Street, NW
                          Suite 800
                          Washington, D.C.  20036-3406
                          (202) 778-6172
                          BARBARA J. OLSHANSKY, ESQUIRE
                          CENTER FOR CONSTITUTIONAL RIGHTS
                          666 Broadway
                          New York, New York  10012
                          (212) 614-6439
For the Defendants:       TERRY M. HENRY, ESQUIRE
                          U.S. DEPARTMENT OF JUSTICE
                          CIVIL DIVISION
                          20 Massachusetts Avenue, NW
                          Room 7144
                          Washington, D.C.  20530
                          (202) 514-4107
Court Reporter:           REBECCA KING, RPR, CRR
                          Official Court Reporter
                          Room 4802-B, U.S. Courthouse
                          Washington, D.C. 20001
                          (202) 898-9398

Proceedings reported by machine shorthand, transcript produced
by computer-aided transcription.

Abu Bakker Qassim, et al. vs.     CV 05-497      August 25, 2005
George W. Bush, et al.

Page 2

```
 1                    P R O C E E D I N G S
 2              COURTROOM DEPUTY:  Civil action number 05-CV-497,
 3    Abu Bakker Qassim, et al. versus George W. Bush, et al.
 4    P. Willett and Susan Baker Manning for the plaintiff; Terry
 5    Marcus Henry for the defendant.
 6              THE COURT:  Counsel, I set this hearing by an order
 7    that I issued last week, perhaps somewhat hopefully, thinking
 8    that between then and now the parties might have an opportunity
 9    to talk with each other and perhaps work out what I have called
10    a just and honorable solution to the problem before us.
11              And I don't have any particular agenda for this
12    hearing, except I do have a number of questions.  But I think we
13    should begin, perhaps, simply by asking -- well, the petitioner
14    can go first.  Tell me if you will, sir, what changes, if any,
15    have occurred since you were last here on August 1st, and what
16    the present situation is with your clients, as you understand
17    it.
18              MR. WILLETT:  Good afternoon, Your Honor.  Sabin
19    Willett of Bingham McCutchen for the petitioners.  With me is
20    Susan Baker Manning and the Center For Constitutional Rights.
21              Mr. Henry and I did have a chance to speak after your
22    order.  We were not able to narrow our differences.  What has
23    happened with respect to my clients is that on the 19th of
24    August, Ms. Manning and I were able to communicate by telephone
25    with them.  Also on that day, my client Adel Abdul Hakim spoke
```

Abu Bakker Qassim, et al. vs.                    CV 05-497                         August 25, 2005
George W. Bush, et al.

Page 3

 1   by telephone with his sister.  It was a little bit awkward to

 2   organize that; his sister had to travel to Stockholm to the

 3   U.S. Embassy and speak on a secure phone.  But my grandmother

 4   always said, if you don't like someone's coat, you should

 5   compliment her hat, so we do compliment the Government's hat for

 6   arranging that telephone call.

 7          It is my understanding that our clients are in a place

 8   called Camp Iguana.  It's still a prison; there are, as I

 9   understand it, somewhat better conditions than the prison they

10   used to be in.

11          The other development I would say, Your Honor, is one

12   that I have not learned myself, I have been reading about it in

13   the press.  And that is, it now appears from the public

14   statements both that Ambassador Prosper made on the radio this

15   morning and that were reported by the Washington Post yesterday,

16   that the Government has been involved in this effort for

17   two years, that they have struck out with two-dozen countries,

18   and that this thing isn't going anywhere any time soon.

19          And I don't know if now is the time to argue, or you

20   have other questions, but I did want to at some point today

21   return to what we now see is the only legitimate solution to

22   this problem.

23          THE COURT:  You have met with your clients once.  Is

24   that correct --

25          MR. WILLETT:  That's correct, Your Honor.

United States District Court                    202-898-9398              Rebecca King, RPR, CRR
For the District of Columbia                                             Official Court Reporter

Page 4

```
 1          THE COURT:  -- or on one series of occasions?

 2          MR. WILLETT:  We have a meeting scheduled for Monday as

 3   well this week in Cuba.  But we met them only once before now.

 4          THE COURT:  And you're going to Cuba again?

 5          MR. WILLETT:  Sunday, yes.

 6          THE COURT:  What are the logistics of you going to

 7   Guantanamo Bay?

 8          MR. WILLETT:  You fly to Ft. Lauderdale and you there

 9   present a theatre clearance to a little airline called

10   Aero Sunshine, the sort of airplane where they ask you what you

11   weigh and then they say, you sit in this seat and you sit in

12   that seat.  And then you fly three hours to Gitmo.

13          You are billeted at the combined bachelor's quarters,

14   which costs $12 a night and is worth every penny, and then in

15   the morning they take you across on a ferry to the windward

16   side, where you're met by a Navy chief petty officer, who

17   escorts you to the prison.

18          You meet your client at what they call Camp Echo at the

19   prison for certain hours of the day where this is permitted, and

20   then you're escorted back to the ferry at the end of the day.

21          THE COURT:  Do you have any information about the

22   conditions under which you'll be able to meet your clients this

23   time at Camp Iguana?

24          MR. WILLETT:  I don't, Your Honor.  I don't know that I

25   would be able to meet them at Camp Iguana, though I would like
```

Page 5

1    to.  I think the Government's practice is to bring all habeas

2    counsel to Camp Echo and meet them in the conditions that I

3    described last time we were together.  Meeting them at Camp

4    Iguana would be helpful because we would get a sense of what

5    their current situation is like, but to be candid, Mr. Henry and

6    I haven't spoken about whether I would be permitted to do that.

7                THE COURT:  You say that you and Mr. Henry have met but

8    have not been able to narrow the differences between you.  Is

9    that right?

10               MR. WILLETT:  We spoke, Your Honor.  We did not meet.

11   But it is correct that I think it's safe to say, we did not

12   narrow the differences.

13               THE COURT:  All right.  Thank you.  Thank you, sir.

14   Maybe I should hear from Government counsel.

15               MR. HENRY:  Thank you, Your Honor.  Terry Henry with

16   the Department of Justice.  I'm here for the respondents.

17               Your Honor, just to clarify, petitioner's counsel and

18   myself did speak once on Monday about Your Honor's order, and

19   counsel had some questions.  I don't think the discussion was

20   any kind of negotiation over things.  So just to make it clear

21   for the record what's going on here.

22               But there have been a number of developments since we

23   submitted the last declaration of General Hood in this matter on

24   August 8th, along with our supplemental brief, and I'm happy to

25   report to the Court on what those developments are.

Abu Bakker Qassim, et al. vs.                    CV 05-497                         August 25, 2005
George W. Bush, et al.

Page 6

```
 1              THE COURT:  I would be happy to hear them.

 2              MR. HENRY:  As counsel indicated, on Friday the 19th

 3    there was a telephone conference between counsel and both

 4    petitioners in this case.  They were able to use the translator

 5    that they had mentioned to the Court at the last hearing, who

 6    does not have a security clearance, but as indicated in General

 7    Hood's declaration, DOD is okay with that translator being used

 8    subject to appropriate security conditions.  And that happened.

 9              There was also --

10              THE COURT:  Just let me stop you with that.  That was a

11    telephone call, a telephone conference between counsel with

12    their clients and their interpreter?

13              MR. HENRY:  That's correct.

14              THE COURT:  Was it a monitored call?

15              MR. HENRY:  It was monitored by a member of the

16    privilege team, which under the protective order regime in this

17    case is a DOD person that's basically responsible for reviewing

18    materials that counsel learns from detainees that counsel wants

19    to use in an unclassified context for classification purposes.

20              The protective order operates on the assumption that

21    information learned from the detainee is either classified or

22    subject to protection; then, when counsel want to use that

23    information in an unclassified context, filing or go to the

24    press or whatever, they run it through the privilege team who

25    does a classification review on it.  And that privilege team is
```

Page 7

1    segregated from the litigation other than their involvement in

2    the...

3             THE COURT:  Mr. Henry, help me understand this

4    classification business.  These petitioners have been designated

5    as no longer enemy combatants.  Right?

6             MR. HENRY:  That's correct.

7             THE COURT:  What do they know, could they say that

8    would be classified?

9             MR. HENRY:  Well, as General Hood pointed out in his

10   declaration, there are two main areas of information that is of

11   concern.  And the first deals with security measures at the camp

12   itself.  That may be classified or it may just be information

13   that would be deemed protected under the protective order, which

14   is entitled to being treated like under seal and that kind of

15   thing, as opposed to being classified.

16            THE COURT:  But if they have that kind of information,

17   how can they ever be let out?

18            MR. HENRY:  Well, Your Honor, the purpose of the

19   classification review is to review the information and just see.

20   I mean, Gitmo is aware of the situation if people are let out

21   and if there needs to be any change to the way things are done,

22   things like that, but while folks are there in the camp, there

23   is the concern about sharing, you know, concurrent information,

24   if you will, about that.

25            So that information is just reviewed by a privilege

Page 8

1    team member, it's either classified or not, and then things go

2    forward.

3            The other class of information that's involved is

4    information about the status of other detainees.  And again,

5    it's just, you know, a precaution with respect to information

6    they would be sharing while they continue to be detained there.

7            This regime has been in place for almost a year now.

8    It works, with complaints by petitioner's counsel as well as

9    complaints on the other end, but it has worked well for the past

10   your or so.  I might add, the monitoring by the privilege team

11   member was with the agreement of counsel.

12           The other thing that happened on this past Friday was,

13   as petitioner's counsel mentioned, the call between one of the

14   petitioners and the sister, his sister that was identified at

15   the last hearing.  And just to make one correction to what

16   Mr. Willett said, it was not over a secure phone, it was over an

17   unsecured line, just a normal telephone call to the embassy

18   there in Sweden.  The embassy was involved just to make sure

19   that the person receiving the call on the other end was actually

20   the person that was identified as the petitioner's sister.  So

21   that call went on for an hour and a half or so.

22           The other major area of development deals with the

23   living arrangements that the petitioners are in in Camp Iguana.

24   As noted in General Hood's declaration, there had been plans in

25   the works for a number of weeks to renovate Camp Iguana for

Page 9

1    folks NLEC's like petitioner, where they could stay pending

2    their relocation or whatever.

3              As indicated in General Hood's declaration, that

4    renovation was accomplished and the petitioners were moved there

5    the week of August 15th.  The camp is made up of several

6    buildings; there is a sleeping quarters building that's air

7    conditioned and they have individual beds.  All the living

8    quarters there at Camp Iguana are air conditioned, there's a

9    recreation building where there are sofas, television, video

10   games, other recreational materials, ping-pong tables, table

11   soccer, that kind of thing.

12             There's a kitchen building, where, although the

13   petitioners are provided three meals a day that are prepared in

14   Halal fashion, they do have a kitchen-type affair, a building

15   that has a microwave, refrigerator, coffee pot, stove, utensils,

16   and they get tea, coffee, fresh fruit, ice cream, things like

17   that, snack items.

18             There is a bathhouse that has separate shower stalls,

19   separate toilet stalls similar to the type of building that's

20   used for troops in some of the more permanent camps in the

21   Middle East.  There's an outside recreation yard with picnic

22   tables and that sort of thing, a soccer goal, that kind of

23   stuff.

24             The petitioners have 24-hour access to all of these

25   materials -- or all of these facilities, and this is in addition

Page 10

```
 1   to the medical care and access to Qur'ans and prayer books and
 2   things like that that all the other detainees have.
 3            THE COURT:  There's no lockdown in any part of this
 4   facility, this Camp Iguana?
 5            MR. HENRY:  They are free to roam that facility.
 6            THE COURT:  24/7?
 7            MR. HENRY:  24/7, yes, Your Honor.
 8            THE COURT:  But there's a gate around it?
 9            MR. HENRY:  There is a fence.
10            THE COURT:  A fence around it?
11            MR. HENRY:  Yes, Your Honor, there is.
12            THE COURT:  How many people are there?
13            MR. HENRY:  Currently there are about 10 NLEC's total,
14   and all of the NLEC's, all the Uighur NLECs are there.  I think
15   we had mentioned before that -- in General Hood's declaration
16   that there were a couple of NLEC's that were in another camp due
17   to disciplinary infractions.  I think two of those were Uighurs,
18   and those two Uighur folks have been moved to Camp Iguana.
19            I believe that there is one or two other nationality
20   NLEC's that are in a disciplinary confinement situation, and one
21   that is in another area due to medical needs.  You know, he's
22   not there for disciplinary reasons.
23            THE COURT:  There are 10 Uighur NLEC's, or 10 NLEC's
24   all total?
25            MR. HENRY:  All total.
```

Abu Bakker Qassim, et al. vs.
George W. Bush, et al.

CV 05-497

August 25, 2005

Page 11

```
 1            THE COURT:  Of whom how many are Uighurs, are you able
 2     to tell?
 3            MR. HENRY:  I'm not able to say on the public record,
 4     but it's just a handful.
 5            THE COURT:  And when counsel come down to Gitmo next
 6     week to meet with these people, will they be able to meet with
 7     them in a free and open manner at Camp Iguana, or are they going
 8     to have to be taken back over to Camp Echo and be shackled to
 9     the floor again?
10            MR. HENRY:  All of the meetings at Camp Echo; as a
11     matter of practice, there are safety considerations that we've
12     talked about before.  The shackling is one leg to a bolt in the
13     floor, standard operating procedure, the purpose of which is to
14     prevent any sort of incident where someone could, you know, hurt
15     someone else.  Which attempts like that are not unheard of.
16     It's difficult for DOD to have basically a nonuniform policy in
17     this regard with respect to specific individuals, that kind of
18     thing.  They have, like I said, a standard operating procedure
19     there.
20            But all of the counsel meetings are there in Camp Echo.
21     There would be concerns about having some kind of meeting
22     arrangement in Camp Iguana; number one because there's not
23     facilities for it there, and number two, there's the aspect of
24     subjecting other NLEC's over there in Camp Iguana to inspection,
25     if you will, by outsiders.
```

Abu Bakker Qassim, et al. vs.                          CV 05-497                          August 25, 2005
George W. Bush, et al.

Page 12

```
 1            There is one change, though, with respect to the

 2     meetings at Echo, and that's that counsel would be able to use

 3     the translator that doesn't have a security clearance.

 4            THE COURT:  That does not have a security clearance?

 5            MR. HENRY:  That's right.

 6            THE COURT:  They can bring their interpreter down with

 7     them?

 8            MR. HENRY:  Yes.  And I understand that's their

 9     intention.

10            THE COURT:  Well, you anticipated my next question.

11     What about mail?  What about mail facilities?

12            MR. HENRY:  Mail facilities?

13            THE COURT:  Can they receive mail and send mail?

14            MR. HENRY:  Absolutely.  In fact, we have addressed

15     this in the context of other motions that have been filed in

16     other cases.  The mail operation at Gitmo is quite extensive.

17     It involves thousands of pieces of mail a month, and the mail

18     is -- you know, they can send mail, they can receive mail,

19     they're given postcards and stationery on which to write stuff

20     and mail letters that's processed through the security apparatus

21     there at Gitmo, and it is forwarded on.  And the same happens in

22     reverse for incoming mail from family members or whoever.

23            And then, of course, there's the attorney-client mail,

24     which is a different operation that does not go through the

25     security monitoring apparatus, and pursuant to the regime that
```

Abu Bakker Qassim, et al. vs.                    CV 05-497                    August 25, 2005
George W. Bush, et al.

Page 13

1    was worked out in the protective order.  So that mail remains

2    privileged.

3            THE COURT:  Are these petitioners literate in their own

4    language, or do you know?

5            MR. HENRY:  I believe they are, Your Honor.  But I

6    don't know for sure.

7            MR. WILLETT:  They are.

8            THE COURT:  And again, is every telephone call as

9    complicated as the call from this one petitioner to his sister?

10   Do they have to arrange something?

11           MR. HENRY:  The family call -- the calls with family

12   members is actually a very rare occurrence.  It had been done,

13   my understanding is once before, with respect to a military

14   commissioned candidate.  So this is a relatively new practice

15   for Guantanamo.  There was this concern, especially since the

16   first time anybody on the Government side had heard about the

17   petitioner's sister -- and my understanding from the last

18   hearing was that the sister basically cold called Mr. Willett.

19   There was some concern just to make sure that the person on the

20   other end of the call was who, you know, they purported to be.

21           And for now, the easiest way to do that was to ask the

22   sister to go to the embassy, which I understand is about 45 or

23   so miles from where she currently lives.  She did that, the

24   embassy confirmed her identity and then accepted the call, gave

25   her the phone, let her talk.

Abu Bakker Qassim, et al. vs.                    CV 05-497                    August 25, 2005
George W. Bush, et al.

Page 14

```
 1              With respect to family members in other situations, if
 2       there would be some easier way to do it, it's hard to say right
 3       now, just because this is one of the very few calls that have
 4       actually happened.  As General Hood indicated, he was amenable
 5       to making a provision for family calls for NLEC's, so I'm sure
 6       going forward they'll get a process down.  But right now that's
 7       what we have.
 8              THE COURT:  But as I hear you state it, the calls would
 9       be, A, monitored, and B, these people, although officially
10       designated no longer enemy combatants, you're not willing to say
11       they're no longer under suspicion, so there still has to be some
12       double checking of who they're talking to?
13              MR. HENRY:  Well, there are a couple of issues in
14       there.  I mean, number one is the double checking who they're
15       talking to, that's for a number of reasons, including just to
16       avoid having some crackpot on the other end, if you will, who
17       happens to learn the name of a relative of one of the NLEC's.
18              THE COURT:  Whose problem is it if there's a crackpot
19       on the other end of the line?
20              MR. HENRY:  Well, Your Honor, having these phone calls
21       is a resource intensive operation at Guantanamo, and aside
22       from --
23              THE COURT:  Are you talking about money?
24              MR. HENRY:  Talking about resources as far as moving
25       the detainee to where a phone is and getting that all set up.
```

1         But also I think Guantanamo has an interest in not

2    subjecting a detainee to receiving prank phone calls, if you

3    will.  So there are interests involved there.

4         With respect to the monitoring, again, that's an item

5    that was worked out in the protective order regime and is

6    allowed, monitoring of family calls, and --

7         THE COURT:  But the protective order regime had to do

8    with detainees, enemy combatant detainees, didn't it?

9         MR. HENRY:  Your Honor, when we negotiated that

10   protective order, the Combatant Status Review Tribunal process

11   was ongoing.  So I think it's fair to say that, you know, we

12   didn't know the precise outcome of all of those, and the order

13   was negotiated just in a broad brush sense applicable to

14   everyone.

15        THE COURT:  Well, you urged me the last time I was

16   here -- you were here not to mess around with the protective

17   order that had been negotiated with such difficulty and at such

18   length and in so many cases, and I have foreborne, if that's the

19   right form of that verb, from doing so for 25 days.  But I think

20   one of the questions that's in my mind is whether that

21   protective order works for NLEC's.

22        So that's kind of on the table.  I mean, it's

23   unthinkable, I imagine, for the Government just to put a phone

24   booth in Camp Iguana.

25        MR. HENRY:  That's correct, Your Honor.  If I could

Abu Bakker Qassim, et al. vs.                    CV 05-497                          August 25, 2005
George W. Bush, et al.

Page 16

```
 1   make one suggestion --
 2           THE COURT:  It's difficult for me to understand why
 3   that's unthinkable, actually.
 4           MR. HENRY:  Well, there could be any number of reasons,
 5   including, again, just keeping an eye on who is being called;
 6   you know, do we give the detainees international calling cards?
 7   You know, there are logistical as well as other issues.
 8           But if I could make one suggestion.  If the
 9   petitioner's counsel has got problems with particular aspects of
10   the order, they can bring them up and we can talk about it, and
11   I can see if the client is willing to loosen things up.  I mean,
12   General --
13           THE COURT:  That's kind of what I was hoping might
14   happen before today.  But maybe it will happen after today.
15           MR. HENRY:  Well, Your Honor, the protective order is
16   very long, it's very complex.  There are a lot of provisions in
17   it, all of which were negotiated at length and was approved by
18   Judge Green.  So they deal with mail, they deal with phone
19   calls, they deal with all kinds of stuff.
20           So I think, you know, expecting a wholesale
21   renegotiation of that may not be practical.  It would very well
22   be very time-consuming.  I think probably the best way to
23   proceed would be to take things on a little more incremental
24   level, and if there are specific problems that exist, we'll try
25   to work it out.
```

Page 17

```
 1            THE COURT:  I will borrow from Mr. Willett's analogy

 2    and say, I can't exactly compliment your coat, but I'm going to

 3    take that "maybe we can loosen things up," quote, unquote, as a

 4    nice compliment on your hat.

 5            MR. HENRY:  Thank you, Your Honor.

 6            THE COURT:  Now, I asked you in the order to be

 7    prepared to make an in camera presentation of the details of

 8    efforts to place these petitioners, and I don't know how you

 9    propose to -- whether you have something for me in writing,

10    whether you want to adjourn literally for an in camera

11    proceeding, but I would like to hear what's going on.

12            Last time I said I wasn't sure I did want to know what

13    was going on, but I think I'm ready.

14            MR. HENRY:  Well, Your Honor, I'm prepared to brief the

15    Court orally, and at the level of detail that I've been

16    authorized to talk about, we can do this with cleared counsel in

17    chambers if you want to do it that way.

18            THE COURT:  Who's cleared?

19            MR. HENRY:  I believe Mr. Willett is.

20            MR. WILLETT:  And Ms. Manning, Your Honor.

21            THE COURT:  Then when we adjourn here we'll go to

22    chambers and do just that.  Thank you.

23            I would like to talk a little bit more about the big

24    picture.  It's been almost six months now since these men were

25    declared to be NLEC's.  Does the Government have a position on
```

Abu Bakker Qassim, et al. vs.                    CV 05-497                    August 25, 2005
George W. Bush, et al.

Page 18

1    the length of time that it would be reasonable to continue

2    holding them in this status if you still can't find any place

3    for them?

4           MR. HENRY:  Well, Your Honor, I believe our position is

5    that the condition -- the living arrangements as they currently

6    exist meet and exceed any kind of level that would be

7    appropriate as a matter of constitutional law or any kind of

8    situation like that, and that we would continue to hold them --

9           THE COURT:  You're not saying constitutional law.  You

10   don't think the Constitution applies down there, do you?

11          MR. HENRY:  That's correct.  But one issue with

12   addressing the living arrangements, if you will, is what kind of

13   standard are you going to apply.  And the only analogy of which

14   I'm aware -- and the Court's involvement in living arrangements

15   with respect to individuals detained in the course of a war has

16   not been done of which I am aware.  But the only area of

17   analogy, of course, would be the administration of prisons with

18   respect to other convicted folks or pretrial detainees.  So

19   that's what I'm referring to.

20          So I think our position would be that we can continue

21   to hold them in Camp Iguana or something like it as long as it

22   takes.

23          Now, having said that, the living conditions for the

24   NLEC's have evolved since the NLEC determinations were made.

25   They've evolved significantly.  I have no reason to believe they

United States District Court                    202-898-9398                    Rebecca King, RPR, CRR
For the District of Columbia                                                    Official Court Reporter

Abu Bakker Qassim, et al. vs.                    CV 05-497                    August 25, 2005
George W. Bush, et al.

Page 19

```
 1    will not continue to do that.

 2             And with respect to length of time and that sort of

 3    thing, I can -- I would prefer to talk about that in camera.

 4             THE COURT:  The Government's memorandum submitted after

 5    the last hearing contained a number of rather nonspecific

 6    concerns about what might happen if the petitioners were to set

 7    foot in the United States.  And we don't have to rehearse all

 8    those.  Your papers say what they say.  They betrayed in my

 9    mind -- those of you in the audience who are not lawyers or

10    products of the American law schools don't take this phrase off

11    and put it in the newspapers, because it's a lawyer's phrase.

12    Imaginary horribles.

13             Has the Government refined its position on this -- on

14    whether there's any circumstances in which these people might be

15    even considered refugees admittable to the United States or

16    admittable on some sort of limited parole that would not commit

17    them to the United States?

18             MR. HENRY:  Well, Your Honor, I think our position was

19    set out in our brief, and I don't think it would be imaginary

20    that bringing them here would change their immigration status

21    significantly.  And I think that's still the case.

22             As far as further details on that and what may be the

23    Government's thinking, just like the courts, we try to wait for

24    specific situations before we commit anything publicly as to

25    what our position would be.
```

Abu Bakker Qassim, et al. vs.                    CV 05-497                        August 25, 2005
George W. Bush, et al.

Page 20

```
 1              THE COURT:  I've noticed that.  I've noticed that.

 2              All right.  Thank you, Mr. Henry.

 3              Mr. Willett, your turn.  Do you have any comment or

 4     questions about what we've just discussed here with Mr. Henry?

 5              MR. WILLETT:  No, Your Honor.  What I do want to

 6     address is interim release under the SARD case, and I don't know

 7     whether it's better to do that after the chambers conference or

 8     now.  Because what we're reading in the newspapers and what I

 9     think you're going to hear in chambers is they're not going to

10     fix this internationally, not any time soon.  They've been at it

11     for two years, according to the Washington Post, according to

12     NPR.  I mean, they had Ambassador Prosper on the radio this

13     morning saying they've gone at 24 or 25 countries without

14     success.

15              Evidently some countries are intimidated by the heft of

16     China in the international marketplace; others may ask why a

17     particular administration with a go-it-alone philosophy about

18     foreign affairs now comes to them for help.  I'm not a diplomat.

19     I don't know.

20              But what I do know is, it's not working.  It's not

21     going to work next month, it's not going to work in six months,

22     it's particularly not going to work if we just fluff up the

23     pillows a little bit at Gitmo and leave them there, with no

24     particular pressure on the government to make something happen.

25              So whenever it's appropriate, I want to talk to you
```

Page 21

1    about prophesy, because I would like to propose a different

2    prophesy than the one Your Honor suggested in your August 19th

3    order.  It looks like now is the time.

4            THE COURT:  I think now is the time.

5            MR. WILLETT:  Okay.  Let's go back to what nobody can

6    argue with, because the Supreme Court said it in Rassoul.  And

7    that's that you have jurisdiction in this case, which means that

8    you have jurisdiction of the case and the petitioners.  An act

9    of Congress says you can bring them to this courtroom.  No one

10   could question that, either.

11           We then move to the Court of Appeals for this circuit,

12   which has said that a habeas judge having jurisdiction of a case

13   has the power before the final determination of the writ to

14   order appropriate, in effect, parole, conditions of interim

15   release.  And at such a hearing you have to consider, is there a

16   danger to the community, does the petitioner represent a danger

17   to himself, is there a risk that he would flee, all of those

18   things that nobody better than the Federal District Court knows

19   how to do, because you do it all the time in slightly different

20   circumstances.  You have that power.  I don't think anyone can

21   argue with that power.  So we have to ask ourselves, would this

22   be the case that the Court of Appeals would determine to rip

23   from the jurisdiction of the federal trial court?

24           And here's why I suggested a different prophesy:  The

25   first is that there's actual a technical inaccuracy in your

Abu Bakker Qassim, et al. vs.          CV 05-497           August 25, 2005
George W. Bush, et al.

Page 22

```
 1    opinion.  The Court of Appeals did not stay Judge Hens Green's

 2    order, she stayed it herself.  As far as I know, they've never

 3    yet tipped their hand in a habeas case that didn't involve the

 4    process for a military tribunal.

 5           Why they wouldn't tip it has partly to do, of course,

 6    with the unarguable, unassailable propositions I just laid out

 7    for you in terms of your jurisdiction.  It has partly to do, I

 8    think, because they know their own supervisory court expressed

 9    in Hamdan, expressed in Rassoul, expressed in Zadvadus a real

10    horror of indefinite incarceration.  That was the thing to be

11    feared.  I think I just heard Mr. Henry say they're going to be

12    there as long as it takes.

13           THE COURT:  That's what I heard, too.

14           MR. WILLETT:  So is this the case, where people have

15    been determined not to be enemy combatants, where they would

16    leap in to take that jurisdiction from the trial court?

17           My prophesy -- I'm going to go with Justice

18    Frankfurter, Your Honor, who on several occasions referred to

19    the fairness, the common sense, and the courage of the District

20    Court in this country.  And I'm going to believe the Court of

21    Appeals, just like this Court, believes in the rule of law, and

22    relies, just as everyone else does, on the exercise of that

23    common sense, fairness, and courage.

24           So my prophesy is a little different.  And I hope it

25    doesn't go too far to say -- because we are talking about
```

Page 23

```
 1    prophesy, and it's all about what's practical, not necessarily

 2    what's legal or even appropriate.  But I guess it is a fact that

 3    we're about to begin a big circus next week or the week after in

 4    the United States Senate.  I don't doubt that the Hamdan

 5    decision is going to be on the table during those confirmation

 6    hearings, and the Court of Appeals may find itself under a

 7    scrutiny from the media that it's not accustomed to.  In that

 8    crucible, is it going to leap into this courtroom to take this

 9    case away?

10          Suppose for a moment that my prophesy is wrong, and

11    suppose that the Government invites a radical degree of judicial

12    activism from the Court of Appeals.  I suppose it's probably

13    100 percent likelihood that they'll ask for a stay.

14          Well, if that happens, Your Honor, I'll just get on the

15    elevator and go to the fifth floor, and with the deepest

16    respect, I think if that happens, it becomes my problem.

17          Now, we've thought long and hard about fluffing up the

18    pillows as opposed to asking you for this relief.  The problem

19    is, if it was 30 days of fluffing up the pillows, we probably

20    wouldn't be asking for it.  We would stick at the base.  It's

21    not going to be 30 or 60 or 90.  It's going on two years.

22          So if there is an order for interim release from this

23    Court after you've had the hearing, let the Government explore

24    any concerns they have about risk to the community, after you've

25    settled a set of terms for appropriate conditional release,
```

Page 24

```
 1    after Mr. Parhat Yassin (ph), who is in the courtroom today and

 2    is a resident asylee Uighur escaped from China himself, and who

 3    has called me up to offer his home as refuge for these people,

 4    after you've heard the evidence, if you issue that kind of

 5    order, the only thing I can tell you is that I'll be proud to

 6    ride the elevator to any floor of this building and defend it.

 7           THE COURT:  Well, it certainly has not escaped your

 8    notice, nor Mr. Henry's, that the concern I had with issuing

 9    this little memorandum the other day was the question of whether

10    something could be done in the interim that would make the lives

11    of these petitioners tolerable pending the reasonable amount of

12    time that it takes to get them placed.

13           If you're right that they're not going to be placed and

14    it's indefinite, well, that puts a different picture on it, and

15    maybe it won't matter so much if it takes a year for the Court

16    of Appeals to sort it out on appeal.  I don't think Mr. Henry is

17    going to even want to respond to what you've just said because

18    it's sort of hypothetical.  Am I right, Mr. Henry?

19           MR. HENRY:  That's correct, Your Honor.

20           THE COURT:  One more question, Mr. Willett.  Is there

21    any dispute about the conditions under which these people are

22    being held, or about the appropriateness or necessity of the

23    conditions under which they're now being held?

24           MR. WILLETT:  Oh, yes.  I mean, Your Honor, I don't

25    think they should be held behind any fence.  If you mean do we
```

Page 25

```
 1    dispute the nature of the kitchen and so forth, I don't know the

 2    facts myself.  We didn't get in to them on the 19th.  So I don't

 3    have a basis today to dispute what Mr. Henry told you about the

 4    living conditions.

 5              THE COURT:  I'm just wondering what purpose might be

 6    served, if any, if the petitioners can't be brought here, if

 7    their bodies can't be brought here, if perhaps a magistrate

 8    judge of this court might go there.  And I'm wondering what

 9    purpose such a visit might have.

10              MR. WILLETT:  We welcome anyone going there, the Court,

11    the press, us, anybody.  We think that's a good thing.  What I

12    would suggest, though, is that the only remedy that's really

13    going to make sense is to open up the gate, and since they don't

14    want to do that on Gitmo, we're down to the District of

15    Columbia.  So we think ultimately they should be here and they

16    should not be in any kind of jail.

17              While we understand that since the ultimate resolution

18    is probably going to be, in effect, a deportation subject to

19    Your Honor 's being satisfied with the place they're being

20    deported to --

21              THE COURT:  You really think I'm going to have anything

22    to say about that?

23              MR. WILLETT:  Well, you will, actually, Your Honor, if

24    you retain jurisdiction of the case by not concluding the habeas

25    case.  That's why interim release seemed like the perfect fit
```

Abu Bakker Qassim, et al. vs.               CV 05-497               August 25, 2005
George W. Bush, et al.

Page 26

```
 1   here.  You still have the case, it's not a final order, you have

 2   jurisdiction of it, and when Mr. Henry comes in and says we've

 3   talked the Netherlands into it or talked Sweden into it or

 4   whatever we can do, at that point they will be sent to that

 5   country and the case will be dismissed as moot.

 6        But the interim release has that nice feature of Your

 7   Honor's retained jurisdiction, which I think addresses their

 8   parade of horribles.

 9        THE COURT:  Okay, Mr. Willett.  Thank you.  Well,

10   people sitting out in the courtroom may be wondering what has

11   happened.  I'm not sure much of anything has happened, but we've

12   had a conversation, we're now going to have a conversation in

13   camera.  That will be in chambers, it will be among the

14   government counsel and other cleared counsel.

15        Since I don't think we have a cleared court reporter,

16   it's going to be off the record.  Any problem with that,

17   counsel?

18        MR. WILLETT:  No, Your Honor.

19        MR. HENRY:  No, Your Honor.

20        THE COURT:  In that case we will adjourn this

21   proceeding and I will see counsel in chambers directly.  Thank

22   you.

23        (Proceedings adjourned at 2:55 p.m.)

24

25
```

Abu Bakker Qassim, et al. vs.                    CV 05-497                        August 25, 2005
George W. Bush, et al.

Page 27

1              CERTIFICATE OF OFFICIAL COURT REPORTER

2

3          I, Rebecca King, certify that the foregoing is a

4    correct transcript from the record of proceedings in the

5    above-entitled matter.

6

7

8

9    _____          _____

10   SIGNATURE OF COURT REPORTER                 DATE

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

United States District Court            202-898-9398            Rebecca King, RPR, CRR
For the District of Columbia                                    Official Court Reporter