IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

————————————————————— x
:
AYOUB HAJI MAMET, *et al.*,                    :    Civil Action No. 1:05 CV 01886 (EGS)
:
           Petitioners,           :    Hon. Emmet G. Sullivan
:
          v.                                     :
:
GEORGE W. BUSH, *et al.*,                       :
:
           Respondents.         :
:
————————————————————— x

**PETITIONERS' MEMORANDUM OF LAW IN OPPOSITION TO
RESPONDENTS MOTION FOR ORDER TO SHOW CAUSE WHY CASE
SHOULD NOT BE DISMISSED FOR LACK OF PROPER "NEXT FRIEND"
STANDING AND IN SUPPORT OF PETITIONERS' CROSS MOTION FOR
<u>EXPEDITED ENTRY OF PROTECTIVE ORDER AND OTHER RELIEF</u>**

**ORAL ARGUMENT REQUESTED**

Petitioners Ayoub Haji Mamet, Ahmad Doe, and Aktar Doe, acting on their own behalf and through their Next Friends, Adel Abdul Hakim and Usama Hasan Abu Kabir, and by and through their undersigned counsel, respectfully submit this memorandum in opposition to Respondents' motion for an order to show cause why this case should not be dismissed for lack of proper "next friend" standing or, in the alternative, to stay proceedings pending other appeals. *See* Docket Entry No. 4-1. Respondents' motion is meritless and should be denied.

Petitioners also respectfully move that the Court: (i) order expedited entry of the protective order previously entered by Judge Joyce Hens Green in *Ab-dah v. Bush*, 04-CV-1254 (HHK), and other coordinated Guantánamo detainee cases, (ii) order Respondents to submit a factual return to the Petition as well as each Petitioner's Combatant Status Review Tribunal ("CSRT") file, (iii) grant Petitioners immediate access to undersigned counsel by telephone; and (iv) enter an order in aid of jurisdiction barring the transfer of Petitioners from the Guantanamo Bay Naval Base without at least thirty days' advance, written notice to Petitioners and their undersigned counsel. We believe this relief follows as a natural consequence of the denial of Respondents' motion. Petitioners request a hearing before the Court to address these issues.

## **Preliminary Statement**

Petitioners are Uighurs, a Turkic Muslim minority group native to western China, whom the government has deemed not to be "enemy combatants." Yet they are being held virtually *incommunicado* in military custody in Camp Iguana at the United States Naval Station at Guantánamo Bay, Cuba ("Guantánamo"), without charge, without access to counsel and without being afforded any fair process by which they might challenge their detentions. Because they have no meaningful way of securing legal representation for themselves, Petitioners filed a habeas corpus petition through their Next Friends, Adel Abdul Hakim and Usama Hasan Abu Kabir, and by and through their undersigned counsel, on September 23, 2005 (the "Petition").

Due to restrictions imposed by Respondents on access to and communication with Guantánamo detainees – even detainees like Petitioners, whom Respondents have determined are not "enemy combatants" – we have not yet been able to communicate with Petitioners.

As they have routinely done in other recently filed Guantánamo detainee cases, Respondents argue that Petitioners are not entitled to challenge the legality of their detention through their Next Friends. They contend that Petitioners have failed to demonstrate that they cannot submit petitions on their own behalf and that Petitioners' Next Friends do not have a sufficiently "significant relationship" with them to establish that they are truly dedicated to Petitioners' interests in this litigation. Respondents also suggest that they are unable to identify Petitioners – three Uighurs who have been determined not to be "enemy combatants" of a total population of five Uighurs held in Camp Iguana. Both arguments are baseless and serve only to frustrate and delay Petitioners' rightful access to the Court.

Appended to the instant petition are valid next friend authorizations adequately establishing what common sense and decency can only confirm: Petitioners desire counsel to help them challenge their indefinite detention. In addition, in a separate submission filed under seal Respondents have been provided with additional identifying information that eliminates any doubt as to the identity of the Petitioners – the only Uighur non-"enemy combatants" who had not previously filed a habeas petition. Accordingly, because there is no lawful basis for the government to continue to hold Petitioners virtually *incommunicado* and without immediate access to counsel, the Court should deny Respondents' motion and order the affirmative relief that we seek here in order to expedite Petitioners' access to counsel.

### Background

Petitioners Ayoub Haji Mamet, Ahmad Doe and Aktar Doe are citizens of the Xinjiang Autonomous Region, a western province of China also commonly referred to as

"Turkistan" or "East Turkistan."  They are Uighurs, a Muslim ethnic group that has been brutally oppressed by the communist Chinese government.  Because Petitioners have been denied access to legal counsel, Adel Abdul Hakim, who is presently incarcerated at Guantánamo and is also a Uighur, acts as the Next Friend of Ayoub Haji Mamet, and Usama Hasan Abu Kabir, who is presently incarcerated at Guantánamo and is a citizen of Jordan, acts as the Next Friend of Ahmad Doe and Aktar Doe.  *See* Petition ¶ 4 & Exs. A & B (next friend authorizations).  All of the Petitioners are currently imprisoned in Camp Iguana, which houses approximately eight detainees determined by the government not to be "enemy combatants."  *See* Petition ¶ 4.

The authorization executed by Adel Abdul Hakim states, in relevant part, "I have been asked by Ayoub [redacted], also a prisoner at Camp Iguana, to request a lawyer to file a habeas corpus petition in court, seeking his release."  *Id.* Ex. A (original redacted).  The authorization executed by Usama Hasan Abu Kabir (and witnessed by his counsel Clive Stafford Smith) likewise states, in relevant part, that "the following people who I know from this prison want lawyers and want me to help assert their legal rights in any way possible," including "Aktar" and "Ahmad," who are identified as "Turkestani."  *Id.* Ex. B.

Moreover, we are informed that the October 14, 2005 Declaration of Sabin Willett, submitted to the government for declassification and filing under seal in this case on October 14, 2005 (the "Willett Declaration"), contains information relevant to and supportive of Petitioners' next friend authorizations.  *See* Letter from Sabin Willett to Christine Gunning dated October 14, 2004 (attached as Ex. A to the Declaration of Paul Schoeman (the "Schoeman Declaration")).[1]  In particular, we are informed that paragraphs 8 through 12 of that declaration

---

[1] Mr. Willett is lead counsel for the petitioners in *Qassim v. Bush*, C.A. No. 05-CV-0497 (JR) (D.D.C.).  The *Qassim* case also involves Uighur petitioners, all of whom have been deemed not to be "enemy combatants" but are still being imprisoned indefinitely in Camp Iguana.  One of

KL3:2470892.5

contain information specific to the identification and non-"enemy combatant" status of Petitioners. We do not have access to the Willett Declaration, however, because it is presumptively classified and our pending applications for security clearance have not yet been granted.

There can now be no dispute as to Petitioners' identities or the propriety of their next friend authorizations. Nor is there any good reason why they should not be allowed immediate access to counsel. As alleged in the Petition, Petitioners are among a group of uniquely-situated prisoners seized by mistake in Pakistan, whom the United States government has determined are not "enemy combatants." We believe that this determination was made by a CSRT, a procedure that was developed by the government in response to the Supreme Court's decision in *Rasul v. Bush*, 124 S. Ct. 2686 (2004). The government purportedly charged the CSRTs with making individual determinations as to whether each detainee was an "enemy combatant" and could therefore be detained pursuant to the Executive Order of November 13, 2001, Detention, Treatment, and Trial of Certain Non-Citizens in the War Against Terrorism, 66 Fed. Reg. 57,833 (Nov. 13, 2001). In this case, we believe the CSRTs reached the only logical conclusion they could: that Petitions are not and have never been "enemy combatants."

Petitioners were present in Afghanistan after the United States began military operations in that country in October 2001. However, they did not take up arms against U.S. forces and did not support forces hostile to or engaged in armed conflict with the United States. Petitioners fled Afghanistan after their village was bombed by the U.S. forces, eventually making their way to Pakistan with a large number of other refugees. They were detained by Pakistani authorities and eventually turned over to the U.S. military, which paid a $5,000 bounty for each

the petitioners in *Qassim*, Adel Abdul Hakim, is also Next Friend for Petitioner Ayoub Haji Mamet in this case.

KL3:2470892.5

Petitioner.  *See also* Michelle Faul, "*Guantánamo Detainees Say Arabs, Muslims Sold for U.S. Bounties*," ASSOC. PRESS, May 31, 2005.

Respondents nonetheless continue to detain Petitioners despite the government's repeated acknowledgement that many – if not most – of the Uighurs held in Guantánamo are of no intelligence value, do not threaten the security of the United States and have been determined not to be "enemy combatants."  Indeed, many of the Uighurs, including Petitioners, have been cleared twice – once after a Pentagon review in late 2003 and again in March 2005 – for release from Guantánamo.  *See* Robin Wright, "*Chinese Detainees are Men without a Country: 15 Muslims, Cleared of Terrorism Charges, Remain at Guantánamo with Nowhere to Go*," WASH. POST, Aug. 24, 2005, at A1 ("15 Uighurs have actually been cleared for release from Guantánamo Bay twice, once after a Pentagon review in late 2003 and again last March, U.S. officials said.").  *See also* Petition ¶¶ 5, 13-19.  But the government continues to assert its authority to detain these exonerated civilians for "as long as it takes," Status Conf. Tr. at 18, *Qassim v. Bush*, Civ. No. 05-497 (JR) (Aug. 25, 2005) (the "Status Conf. Tr.") (Schoeman Decl. Ex. B), "to wind up [their] detentions in an orderly fashion."  *Qassim v. Bush*, 382 F. Supp. 2d 126, 128 (D.D.C. 2005).  Respondents, however, have given no indication or assurance that the current "War on Terror" will ever end or that the detentions carried out in connection therewith will ever be "wound up."  Respondents have essentially taken the position that the government can at its whim detain innocent individuals indefinitely based on the fact that at some point in the past it erroneously believed that these people threatened its security.

Petitioners' indefinite, virtually *incommunicado* detention also places them at risk of being transferred to the custody of a foreign government, without a hearing or consideration of the likelihood of their being tortured or killed by the transferee government.  The United States

KL3:2470892.5

has transferred other Guantánamo detainees to other countries to facilitate their interrogation through torture. See *U.S. Behind Secret Transfer of Terror Suspects*, WASH. POST, Mar. 11, 2002. Indeed, the government has argued that Guantánamo detainees may be transferred to the control of another government, including their country of citizenship, for continued detention. *See, e.g., Abdah v. Bush*, Civ. No. 04-1454 (HHK) (RMC), 2005 WL 589812, at *3 (D.D.C. Mar. 12, 2005) (Collyer, J.). It now appears that, in response to recent judicial rulings that the habeas writ is available to Guantánamo detainees, the Defense Department plans to accelerate the pace of rendition. *See* Douglas Jehl, *Pentagon Seeks to Transfer More Detainees from Base in Cuba*, N.Y. TIMES, Mar. 11, 2005.

    Transfer of Petitioners to their home country, China, or to any other country that might subsequently render them to China, would place them at substantial risk of being tortured or even executed. According to the U.S. Department of State:

> The [Chinese] Government used the international war on terror as a justification of cracking down harshly on suspected Uigher separatists expressing peaceful political dissent and on independent Muslim religious leaders. . . Uighers were executed and sentenced to long prison terms during the year on charges of separatism. . . . In October 2003, Uigher Shaheer Ali was executed after being convicted of terrorism. He had been repatriated forcibly from Nepal in 2002, where he had been interviewed by the UNHCR and granted refugee status.

U.S. DEP'T OF STATE, COUNTRY REPORTS ON HUMAN RIGHTS PRACTICES – 2004 (China Report) Introduction and § 5 (2005), subsection on National/Racial/Ethnic Minorities, *available at* www.state.gov/g/drl/rls/hrrpt/2004/41640.htm.

## **Argument**

    "[T]he writ of habeas corpus is the fundamental instrument for safeguarding individual freedom against arbitrary and lawless state action." *Harris v. Nelson*, 394 U.S. 296,

290-91 (1969). "The scope and flexibility of the writ – its capacity to reach all manner of illegal detention – its ability to cut through barriers of form and procedural mazes – have always been emphasized and jealously guarded by courts." *Id.* at 291. "At its historical core, the writ of habeas corpus has served as a means of reviewing the legality of Executive detention, and it is in that context that its protections have been strongest." *INS v. St. Cyr*, 533 U.S. 289, 301 (2001). The Supreme Court extended the protections afforded by the great writ to Guantánamo detainees in *Rasul v. Bush*, 124 S. Ct. 2686, 2699 (2004), holding that "federal courts have jurisdiction to determine the legality of the Executive's potentially indefinite detention of individuals who claim to be wholly innocent of wrongdoing." Respondents now seek to deprive the Court of this jurisdiction and to deny Petitioners the opportunity to challenge the legality of their detention on the grounds that their Next Friends lack standing to file the Petition. Their motion should be denied.

## I.    RESPONDENTS' CLAIM THAT PETITIONERS' NEXT FRIENDS LACK STANDING TO BRING THIS ACTION ON THEIR BEHALF IS MERITLESS

As indicated above, Respondents argue that Petitioners are not entitled to challenge the legality of their detention through their Next Friends for two reasons. First, they argue that Petitioners have failed to demonstrate that they cannot submit petitions on their own behalf. Second, they argue that Petitioners' Next Friends do not have a sufficiently "significant relationship" with them to show that they are truly dedicated to Petitioners' interests in this litigation. Respondents also suggest that the factual allegations in the Petition are insufficient to identify Petitioners among the many Guantánamo detainees. None of these arguments is supportable.

KL3:2470892.5

A.    **Petitioners' Ability to Challenge Their Detention on Their
<u>Own Behalf or Through Family Members Is Wholly Illusory</u>**

Respondents contend that Petitioners may file habeas petitions on their own
behalf because the Department of Defense ("DOD") has notified each Guantánamo detainee of
his right to file a habeas petition and has provided each detainee with the address of the District
Court.  *See* Resp'ts' Br. at 4-5.  Respondents also argue that DOD has taken "affirmative steps to
facilitate legal representation for detainees" who have indicated a desire to challenge the legality
of their detention by providing them with a form to complete and mail to the American Bar
Association, which has agreed to recruit volunteer counsel for detainees desiring representation.
*Id.* at 5-6.  In addition, Respondents argue that detainees have been permitted to contact family
and friends who may file habeas petitions on their behalf.  *See id.* at 6-7; *see also* Second
Declaration of Frank Sweigart ¶¶ 3-5, 7 & Exs. A, D (the "Sweigart Decl.") (attached as Ex. A to
Resp'ts' Br.).  Even if true, these measures would be insufficient to render invalid Petitioner's
next friend authorizations and divest the Court of jurisdiction here.

Respondents' contention that they have provided Petitioners and other detainees
with adequate means and opportunity to file habeas petitions is false.  To the contrary, the United
States military has consistently interfered with detainees' access to counsel.  *See* Declaration of
Clive Stafford Smith ¶¶ 97-107 ("Smith Decl.") (Schoeman Decl. Ex. C); *see also* Declaration of
Attorney Barbara Olshansky ("Olshansky Decl.") (Schoeman Decl. Ex. D).  Among other things,
over the last four years the government has:

- Isolated and mistreated detainees who have sought access to counsel;

- Told detainees that they have a better chance of being released if they do not hire a lawyer; and

- Falsely impersonated defense counsel in an effort to get detainees to talk.

*See* Smith Decl. ¶¶ 99-101, 103-04.  In light of such conduct – which to our knowledge Respondents have never denied – the notion that the government might assist detainees in obtaining counsel, or that detainees could trust the military or any attorney referred to them by the military, is simply not credible.

Respondents' contention that Petitioners' family members could file petitions on their behalf is also plainly wrong.  Detainees' families often do not know that their relatives are being held at Guantánamo Bay because the government refuses to divulge even the most basic information about who it is detaining there.  *See* Smith Decl. ¶ 10.  It is often difficult to identify let alone contact detainees' family members and alert them that their relatives are being detained in Guantánamo and desire their assistance in challenging their detention.  Many detainees' family members reside in some of the most remote regions of the world, do not speak English and have no access to the media, the Internet, or any other means of contacting legal counsel or bringing a habeas petition on behalf of detainees.  *See* Smith Decl. ¶¶ 39-42.  In this case, Petitioners were ransomed to the U.S. military in Pakistan after their village in Afghanistan was bombed and after they had previously fled persecution in China.  There is similarly no effective way to identify or locate their family members in Central Asia.

Even if we were able somehow to contact Petitioners' families, Chinese government officials might prohibit or otherwise interfere with their involvement in this case. *See* Smith Decl. ¶¶ 69-77 (discussing foreign governments' interference with access to detainees' families).  This is particularly likely given that Petitioners apparently have already been interrogated by Chinese agents at Guantánamo, and likely remain subject to arbitrary arrest, torture or even death at the hands of the Chinese government.  *See* Petition ¶¶ 31, 45-46.  Many

detainees are reluctant to have a family member act as their Next Friends for fear of placing those family members at such risk. *See* Smith Decl. ¶¶ 88-89.

Respondents' further contention that Petitioners could file petitions on their own behalf is disingenuous. While Respondents claim that detainees are "afforded the opportunity to send and receive mail," and are supplied with pens, paper and envelopes, *see* Resp'ts' Br. at 5 n.3, detainees at Guantánamo are unable to communicate with the outside world, let alone able to locate counsel or file habeas petitions in a district court. Mail frequently does not reach (and is not received from) detainees, or is often significantly delayed, making effective *pro se* litigation impossible. *See* Smith Decl. ¶¶ 79-80. It is also difficult for detainees to communicate with the outside world because many are in poor physical and mental health due to their prolonged detention and mistreatment. *See* Olshansky Decl. ¶ 22.

Moreover, while Respondents contend that each detainee who has been determined not to be an "enemy combatant" has been advised of his status and his right to challenge his detention in the District Court, the Enemy Combatant Notices ("ECNs") allegedly provided to such detainees are not sufficient to advise them fully or adequately of their rights. The ECNs are vague and ambiguous, provide no practical information about how to file habeas petitions in the District Court, and contain inadequate descriptions of detainees' legal rights to ensure that they will get the legal representation that they desire or need. *See* Smith Decl. ¶¶ 108-116 (describing inadequate notices); Olshansky Decl. ¶¶ 18-22 (same); *see also* Sweigart Decl. Exs. C & D. Based on detainees' experiences in other cases, there is also reason to doubt that the ECNs are being translated properly into languages that detainees understand. *See* Smith Decl. 117-19. Indeed, we would be surprised if the ECNs had been translated into Uighur given the relative unavailability of Uighur translators. *See*, *e.g.*, Declaration of Jay W. Hood ¶ 8 (the

"Hood Decl.") (noting "scarcity of Uighur translators") (Schoeman Decl. Ex. E). These problems only exacerbate the obstacles faced by detainees who often are not well-educated and have no ability to understand the American legal process, even assuming they can write or communicate in English.

Although Respondents' point out that 55 detainees have already filed *pro se* petitions, that fact provides no basis for granting Respondents' motion in this case. As one court has already concluded, *pro se* litigation by Guantánamo detainees is effectively impossible. In *Al-Odah v. United States*, 346 F. Supp. 2d 1, 8 (D.D.C 2004) (Kollar-Kotelly, J.), for example, the court considered whether detainees have a legal right to be represented by counsel. The court found specifically that:

> [Detainees] have been detained virtually incommunicado for nearly three years without being charged with any crime. To say that Petitioners' ability to investigate the circumstances surrounding their capture and detention is "seriously impaired" is an understatement. The circumstances of their confinement render their ability to investigate nonexistent. Furthermore, it is simply impossible to expect Petitioners to grapple with the complexities of a foreign legal system and present their claims to this Court without legal representation. Petitioners face an obvious language barrier, have no access to a law library, and almost certainly lack a working knowledge of the American legal system. Finally, this Court's ability to give Petitioners' claims the "careful consideration and plenary processing" which is their due would be stymied were Petitioners to proceed unrepresented by counsel.

*Id.* Accordingly, the court held, "Petitioners cannot be expected to exercise this right without the assistance of counsel." *Id.* This case is no exception.

### B. Respondents' Contention That Petitioners' Next Friends Lack a Sufficiently Significant Relationship with Petitioners to Litigate on Their Behalf Is Baseless

Respondents' contention that the Petition should be dismissed because Petitioners' Next Friends lack a sufficiently significant relationship with them to litigate this action on their behalf also should be rejected.

While Respondents contend that the "dearth of basic biographical and personal information about the detainees on whose behalf relief is sought indicates that the purported next friends do not share any meaningful relationship with these detainees," Resp'ts' Br. at 9-10, Respondents ignore several important unique facts of this case.  As indicated above, the Petitioners and Next Friend Adel Abdul Hakim are being held in Camp Iguana, where only a handful of non-"enemy combatants" are imprisoned.  Mr. Hakim was also Petitioner Ayoub's cell mate.  Both authorizations also state that the Next Friends know the Petitioners and that Petitioners have been asked to help them obtain legal representation. *See* Petition Exs. A & B. We also understand that the Willett Declaration contains additional information that is directly relevant to these issues and supports the validity of Petitioners' next friend authorizations.

We note further that the next friend authorizations in this case comply fully with the procedures specifically outlined by the military for inclusion in the ECNs allegedly provided to non-"enemy combatants" like Petitioners.  Those ECNs specifically provide, in relevant part, that:

> You may ask a civilian judge to look at the lawfulness of your detention through a process called a *petition for a writ of habeas corpus*.  You may ask a **friend** or family member or a lawyer to file such a petition with the court.  If you do not have a lawyer or a family member or a **friend** who could file this petition for you, you may file your own petition.
>
> . . .
>
> [A] court will only consider your case if you file a petition or if one is filed by a lawyer, **friend** or family member on your behalf.

Sweigart Decl. Ex. C (bold emphases added).  Detainees have understood these notices to mean that they may file a request for legal assistance for their "friends" at Guantánamo Bay.  *See* Smith Decl. ¶¶ 86.  Accordingly, it is not surprising as in this case that Guantánamo detainees have enlisted their cell mates and other prisoners – the only friends they have known for the past

four years.  Indeed, apart from their captors in Pakistan and their current military jailors, Petitioners have had no contact with anyone else who could communicate with the outside world on their behalf.

Finally, while Respondents contend that they are unable to identify certain detainees and that some detainees have been identified incorrectly, *see* Resp'ts' Br. at 9-11, Respondents *nowhere* contend that they are unable to identify the Uighur Petitioners in this case, and we believe that the Willet Declaration eliminates any remaining uncertainty.  Even if there were any doubt as to Petitioners' identities, it is Respondents who would bear full responsibility for those problems.  Indeed, Respondents have consistently refused to provide what they believe are the correct names of prisoners, or prisoners' Internment Serial Numbers, which has made identification of individual detainees more difficult.  *See* Smith Decl. ¶¶24-30.  Accordingly, Respondents cannot now be heard to argue that Petitioners' next friend authorizations are somehow improper because of the purported "practical difficulty" of identifying detainees. Resp'ts' Br. at 11.

For all of these reasons, the next friend authorizations in this case are more than adequate to sustain the Court's jurisdiction over the Petition.  If there remains any doubt as to the sufficiency of these authorizations, the Court should order that undersigned counsel be permitted immediate telephone access to Petitioners in order to confirm their identities and their desire for counsel to represent them here.  Absent such relief, at a minimum, Respondents' motion is premature and should be denied on that basis as well.

### C.  Respondents' Alternate Request for a Stay Should Also Be Denied Because Petitioners Have Been Deemed Not to Be "Enemy Combatants"

Respondents' alternative request for a stay pending resolution of appeals in other Guantánamo detainee cases should also be denied.  Respondents specifically contend that this

case should be stayed pending resolution of appeals in *Khalid v. Bush* Nos. 04-CV-1142 (RJL),

355 F. Supp. 2d 311 (D.D.C. 2005), and *In re Guantánamo Detainee Cases*, No. 02-CV-0299

(CKK), 355 F. Supp. 2d 443 (D.D.C. 2005), because this case "raises legal issues that were

squarely addressed by the opinions in [those cases]." Resp'ts' Br. at 18.[2]  But they wholly ignore

a central, dispositive difference between those cases and the instant case – Petitioners here have

been deemed not to be "enemy combatants."  Indeed, as Judge Robertson has already determined

in *Qassim* with respect to the *Khalid* and *In re Guantánamo Detainee Cases* appeals, "[n]either

of the twinned cases now pending before the Court of Appeals presents, or appears to have

contemplated, the case of a detainee who has been brought through the CSRT process and

declared no longer an enemy combatant."  382 F. Supp. 2d at 128.[3]  Accordingly, because the

pending appeals cited by Respondents do not involve non-"enemy combatants" like Petitioners,

and because a stay would otherwise substantially prejudice Petitioners who already have been

held for many years and continue to be held virtually *incommunicado* despite their exoneration,

there is no basis for a stay here.

## II.  THE COURT SHOULD ORDER EXPEDITED ENTRY OF THE STANDARD PROTECTIVE ORDER

Petitioners also move for the expedited entry of the Amended Protective Order

(Schoeman Decl. Ex. F), "Protected Information" Order (Schoeman Decl. Ex. G), and

Supplemental Filing Procedures Order (Schoeman Decl. Ex. H) (together, the "Protective

Order"), previously entered by Judge Joyce Hens Green in *Ab-dah v. Bush*, 04-CV-1254 (HHK),

---

[2] Petitioners also cite *Boumediene v. Bush*, 04-CV-1166 (RJL), which has been consolidated or otherwise coordinated with *Khalid* and likewise does not involve detainees who have been deemed no longer to be enemy combatants.  *See* 355 F. Supp. 2d at 316.

[3] The Court further concluded that the *Qassim* petitioners were "correct, as a formal, legal matter, in their insistence that the issue presented by this case is not before the Court of Appeals." *Id.*

and other coordinated Guantánamo detainee cases. Because the Government will not allow privileged communications between counsel and Petitioners until the Protective Order is entered, Petitioners respectfully ask that the Protective Order be entered promptly.[4]

While counsel for Respondents have refused to consent to the Court's entry of the Protective Order pending a resolution of their instant motion, they state that they "do not intend thereby to block counsel access to properly represented petitioners [and] [t]o that end, if proper next friend standing is found, respondents would not object to entry of the protective order previously entered in other Guantánamo detainee cases, along with appropriate supplementary orders, to permit such access." Resp'ts' Br. at 19 n.17.

We can see no legitimate reason why Respondents would object to the entry of the Protective Order pending a resolution of their instant motion. The only rationale for doing so is to prevent Petitioners' counsel from having access to documents like the Willett Declaration that are purportedly classified but nevertheless directly relevant to Respondents' motion. In any event, because for the Petitioners' next friend authorizations are legally sufficient and Respondents' motion should be denied, there is no reason why the Protective Order should not now be entered.

III.    **THE COURT SHOULD ALSO ORDER RESPONDENTS TO SUBMIT A FACTUAL RETURN TO THE PETITION AND GRANT PETITIONERS IMMEDIATE ACCESS TO COUNSEL BY TELEPHONE**

Petitioners also move for an order compelling Respondents to submit a factual return to the Petition as well as each Petitioner's CSRT file, and granting Petitioners immediate access to undersigned counsel by telephone. Because Petitioners have been determined by the

---

[4] The request for expedited entry of the Protective Order is intended to be without prejudice to the right to challenge or seek modification of any particular terms of the Protective Order in the future as may be warranted by the particular facts and circumstances of this case.

KL3:2470892.5

government not to be "enemy combatants," there is no reason why these requests should not be granted.

The government acknowledged to the court in the *Qassim* case that there are a total of eight non-"enemy combatants," all of whom are being held in Camp Iguana, including some detainees who, like Petitioners, are Uighurs.  *See* Status Conf. Tr. at 10-11.  The court in *Qassim* also found that the government had withheld not only from opposing counsel but also from the court information about the CSRT status of the petitioners for many months.  *See* 382 F. Supp. 2d at 127.  Since counsel for the *Qassim* petitioners learned this information from their clients during a visit to Guantánamo – information which was later confirmed by a JAG officer at the base – they have been able to obtain significant and immediate relief for their clients, including improved living conditions for those petitioners at Camp Iguana, the ability to speak with their counsel by telephone, the ability to speak with at least one family member by telephone, and *in camera* review by the Court of the government's efforts to relocate them.  *See* Status Conf. Tr.

Petitioners here are entitled to the same relief.  Like the petitioners in *Qassim*, the Petitioners in this case are Uighurs who are of no intelligence value, do not threaten the security of the United States and have been determined not to be "enemy combatants."  Respondents should therefore be required to submit a factual return to the Petition as well as each Petitioner's CSRT file, or otherwise confirm in writing that Petitioners have been determined not to be "enemy combatants."  Because Petitioners have been cleared by the CSRT process that the government devised and has represented to the courts is sufficient both to satisfy *Rasul* and determine for its own purposes whether a detainee may be released, there is simply no justification for any refusal by Respondents to submit all factual returns to the Petition.

Like the Uighur petitioners in *Qassim*, Petitioners here should be granted immediate access to undersigned counsel by telephone. There is no justification for the government to deny these cleared detainees immediate access to counsel by telephone after having already determined that they do not present a threat to national security. Respondents have also conceded that such relief is not only feasible but perhaps appropriate. In particular, the commander of the military's Joint Task Force-Guantánamo, Army Brigadier General Jay W. Hood, has stated in *Qassim* that "I have the capability to support a limited number of telephone calls by NLECs,"[5] and "[g]iven the circumstances of petitioners' situation and the scarcity of Uighur translators, if a request for telephone access were submitted, I would be willing to permit counsel to communicate with these two [*Qassim*] detainees by telephone every two weeks while their case is pending." Hood Decl. ¶¶ 6, 8. General Hood also has declared that he is "willing to authorize monthly calls between *all* NLEC detainees and immediate family members over a standard phone line." *Id.* ¶ 9 (emphasis added). That is exactly the relief that we request here.

Finally, in connection with this request for telephone access, we request that undersigned counsel be permitted to communicate with their clients: (i) while their security clearance applications are pending, and (ii) with the assistance of a Uighur translator who is a lawful permanent resident of the United States but who may not have security clearance. Not only have Respondents approved a similar request in *Qassim* (as to the Uighur translator), *see id.* ¶ 8, but there is no basis for the Court to deny this request as to undersigned counsel because, once again, Petitioners have been deemed not to be "enemy combatants" and therefore their cases present no threat to national security.

---

[5] The government refers to detainees who have been cleared by the CSRTs as NLECs, or "no longer enemy combatants."

## IV.    THE COURT SHOULD ISSUE AN ORDER IN AID OF JURISDICTION BARRING THE TRANSFER OF PETITIONERS FROM GUANTÁNAMO WITHOUT AT LEAST THIRTY DAYS NOTICE

Petitioners seek an order in aid of jurisdiction barring their transfer from Guantánamo without at least thirty days' advance, written notice to Petitioners and their undersigned counsel. Respondents' practice of rendering Guantánamo detainees to foreign countries, if applied to Petitioners, would cause them irreparable physical and psychological harm and as a practical matter limit the Court's power to enter effective relief on the Petition. Indeed, Petitioners in this case may be particularly vulnerable to rendition or transfer from Guantánamo at any time because they have been cleared through the CSRT process, and the government may find this an expedient — even if inhumane — option. While we seek Petitioners' release from Guantánamo to a country to be agreed upon with the government, if they were to be transferred before then to China or any other country with close ties to China, they would likely be subject to arbitrary arrest, torture or even death at the hands of Chinese authorities. *See* Petition ¶¶ 31, 45-46.

An order in aid of jurisdiction barring their transfer from Guantánamo without at least thirty days' advance, written notice is appropriate in this case. Petitioners have properly invoked the jurisdiction of this Court. *Rasul,* 124 S. Ct. at 2898. Under the All Writs Act, 28 U.S.C. § 1651(a), this Court has the inherent power to enter the requested injunction. *SEC v. Vision Communications, Inc.*, 74 F.3d 287, 291 (D.C. Cir. 1996). Moreover, similar relief has previously been granted by several courts in this District. *See, e.g., Abdah v. Bush*, Civ. No. 04-1454 (HHK) (RMC), 2005 WL 589812, at *5 (D.D.C. Mar. 12, 2005) (Collyer, J.) (entering a temporary restraining order barring the Government from transferring the petitioners before a hearing on their motion); *Al-Marri v. Bush*, Civ. No. 04-2035 (GK), 2005 WL 774843, at *6 (D.D.C. Apr. 4, 2005) (Kessler, J.) (same); *Al-Joudi v. Bush*, Civ. No. 05-301 (GK), 2005 WL

774847, at *6 (D.D.C. Apr. 4, 2005) (Kessler, J.) (same); *Kurnaz v. Bush*, Civ. Nos. 04-1135 (ESH), 05-0392 (ESH), 2005 WL 839542, at *3 (D.D.C. Apr. 12, 2005) (Huvelle, J.) (same). Alternatively, the government should make a representation to the Court that it will not render or otherwise transfer Petitioners from Guantánamo without providing thirty days' written notice to Petitioners and their undersigned counsel.

KL3:2470892.5

<u>**Conclusion**</u>

       For all of these reasons, we respectfully request that the Court deny Respondents'

instant motion and grant Petitioners' cross motion for an Order: (i) granting expedited entry of

the protective order; (ii) ordering Respondents to submit a factual return to the Petition as well as

each Petitioner's CSRT file; (iii) granting Petitioners immediate access to undersigned counsel

by telephone; and (iv) barring Petitioners' transfer from Guantanamo Bay Naval Station without

at least thirty days advance, written notice to Petitioners and their counsel.

Dated:      New York, New York
              October 18, 2005

                               Respectfully submitted,

                               Counsel for Petitioners:

                               /s/ Paul Schoeman
                               Paul Schoeman (Pursuant to LCvR 83.2(g))
                               J. Wells Dixon (Pursuant to LCvR 83.2(g))
                               Joel Taylor (Pursuant to LCvR 83.2(g))
                               Alison Sclater (Pursuant to LCvR 83.2(g))
                               Michael J. Sternhell (Pursuant to LCvR 83.2(g))
                               KRAMER LEVIN NAFTALIS & FRANKEL LLP
                               1177 Avenue of the Americas
                               New York, New York 10036
                               Tel:  (212) 715-9100
                               Fax:  (212) 715-8000

                               Barbara Olshansky (NY-0057)
                               Tina Monshipour Foster (Pursuant to LCvR 83.2(g))
                               Gitanjali S. Gutierrez (Pursuant to LCvR 83.2(g))
                               CENTER FOR CONSTITUTIONAL RIGHTS
                               666 Broadway, 7th Floor
                               New York, New York 10012
                               Tel:  (212) 614-6439
                               Fax:  (212) 614-6499