IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

———————————————————————— x
                                                        :
AYOUB HAJI MAMET, *et al.*,                             :    Civil Action No. 1:05 CV 01886 (EGS)
                                                        :
                            Petitioners,                :    Hon. Emmet G. Sullivan
                                                        :
              v.                                        :
                                                        :
GEORGE W. BUSH, *et al.*,                               :
                                                        :
                            Respondents.                :
                                                        :
———————————————————————— x

**PETITIONERS' NOTICE OF ADDITIONAL
FACTS IN FURTHER OPPOSITION TO
RESPONDENTS' MOTION FOR ORDER TO
SHOW CAUSE AND IN FURTHER SUPPORT
OF PETITIONERS' CROSS MOTION FOR EXPEDITED
<u>ENTRY OF PROTECTIVE ORDER AND OTHER RELIEF</u>**

## Preliminary Statement

Petitioners Ayoub Haji Mamet, Ahmad Doe, and Aktar Doe, acting on their own behalf and through their Next Friends, Adel Abdul Hakim and Usama Hasan Abu Kabir, and by and through their undersigned counsel, respectfully submit this notice of additional facts in further opposition to Respondents' motion for an order to show cause why this case should not be dismissed for lack of Next Friend standing or alternatively for a stay, and in further support of Petitioners' cross motion for expedited entry of the Protective Order and other relief.

There are several additional facts relevant to the Court's consideration of Respondents' pending motion, which demonstrate why this case should proceed without further delay. First, we received last week unclassified letters from Petitioners confirming that they want us to represent them, which moots Respondents' motion to dismiss. Second, Judge Robertson concluded at a hearing this week in *Qassim v. Bush*, Civil Action No. 05-CV-0497 (JR) (D.D.C.), that Respondents' diplomatic efforts to find a suitable country to which to transfer the non-enemy combatant Uighurs imprisoned in Camp Iguana – including Petitioners in this case – had failed and that he therefore would consider ordering Respondents to release them, which provides additional support for our opposition to Respondents' alternative request for a stay. Based on these new developments, and because Respondents have refused to withdraw their pending motion to dismiss or for a stay, Petitioners respectfully request that the Court deny Respondents' motion.

## Background

Petitioners are Uighurs, a Turkic Muslim minority group native to western China, who are currently detained in Camp Iguana at Guantánamo. On September 23, 2005, Petitioners filed a habeas corpus petition through their Next Friends, Adel Abdul Hakim and Usama Hasan Abu Kabir, because they had no meaningful way to secure legal representation for themselves

(the "Petition").    However, due to restrictions imposed by Respondents on access to and communications with Guantánamo detainees – even detainees such as Petitioners, whom Respondents again have determined are not enemy combatants – we have not yet been able to visit or communicate directly with Petitioners.

As they have routinely done in other recently filed Guantánamo detainee cases, Respondents filed a motion on October 4, 2005, arguing that Petitioners are not entitled to challenge the legality of their detention through their Next Friends, or alternatively seeking a stay of all proceedings in this case.   We opposed that motion on October 18, 2005, and cross moved for, among other things, expedited entry of the standard Protective Order and an order granting Petitioners immediate access to counsel by telephone.   Respondents opposed our motion in its entirety.   The Court has not yet ruled on these two motions.

On December 9, 2005, we obtained unclassified letters from Petitioners confirming their desire for us to represent them in all matters relating to their detention at Guantánamo.   The letters were written in Uighur and had been translated into English.   Copies of these letters with the translations are attached hereto as Exhibit A.   They specifically request legal representation by Michael Sternhell, one of Petitioners' undersigned attorneys.   In a letter dated November 8, 2005, Petitioner Ahmad writes: "On May 9, 2005, [the] American military court declared that I am innocent and I have been waiting to be released ever since. . . . In order to expedite my release, I respectfully ask Mr. Michael Sternhell to be my legal representative in all matters related to my case."   Ex. A.   Petitioner Aktar similarly writes in a letter dated November 12, 2005: "[the] US government has declared that I am innocent after conducting various investigations about me.   However, I am still languishing in this prison.   In order to obtain earlier release and assure a fair treatment, I would like to ask Mr. Michael Sternhell to be

KL3:2484900.3

my attorney." *Id.* Likewise, in a letter dated November 13, 2005, Petitioner Ayoub writes: "It has been 4 years since I have been imprisoned here in Guantánamo by the US government. . . . In order to assure my human rights and to obtain my earliest release, I would like to ask Mr. Michael Sternhell to be my legal representative." *Id.*[1]

We forwarded copies of these documents to the government on December 12, 2005, and asked the government if it would withdraw its Next Friend challenge. The government has not agreed to our request.

## **Argument**

### I. **RESPONDENTS' MOTION TO DISMISS FOR LACK OF NEXT FRIEND STANDING SHOULD BE DENIED AS MOOT IN LIGHT OF ADDITIONAL FACTS**

As indicated above, we recently obtained unclassified letters from Petitioners confirming what their next friend authorizations already established – that Petitioners want us to represent them in all matters relating to their detention at Guantánamo – including without limitation filing the Petition and seeking their immediate release. Accordingly, because there can no longer be any dispute that Petitioners want us to represent them or that the Court has jurisdiction to consider the merits of the Petition, and despite Respondents' inexplicable refusal to withdraw their motion to dismiss on that basis, the Court should dismiss that motion as moot.

Because Respondents' motion to dismiss is now moot, the Court should also grant the relief we requested in our cross motion dated October 18, 2005. In particular, the Court should order expedited entry of the Protective Order because Respondents have only opposed that request on the ground that they had moved to dismiss this case for lack of Next Friend

---

[1] We note that while Petitioners' letters were drafted more than a month ago, we did not obtain them until late last week because they were presumptively classified and we did not yet have security clearance. To date, only two Kramer Levin attorneys have received "interim" clearance.

standing, which was still pending.  Indeed, Respondents argued that "if proper standing is found to exist, the Court should stay this case . . . except for entry of the Protective Order and related orders entered in other Guantánamo habeas cases, which will facilitate counsel access to the detainees."  Resp'ts' Reply Mem. at 3 (Document #11).  The Court should also grant Petitioners immediate access to counsel by telephone because Respondents similarly have only opposed that request on the ground that it was "premature and inappropriate in this context," meaning while their motion to dismiss was pending.  *See id.* at 14 n.16.  Again, Respondents conceded that "[i]f the Court determines that next friend standing exists . . . such requests related to telephone access to detainees are to be brought through counsel to the Commander, JTF-GTMO," who will consider them on a case-by-case basis.  *Id.*

In addition, based on these new facts, the Court should order the government to produce a factual return to the Petition, including Petitioners' CSRT files, each of which we believe will contain a total of no more than a few pages.  As Petitioners' letters once again confirm, the government long ago determined that they are innocent and should be released but continues to detain them indefinitely.  As set forth in our cross motion, a factual return, including the CSRT files, would facilitate counsel's meetings and communications with Petitioners and permit them (and the Court) to address any purported legal justification for their continuing detention.  Indeed, we understand that this Court granted similar relief in *Batarfi v. Bush*, Civil Action No. 05-CV-0409 (EGS) (D.D.C.), on July 20, 2005.

We note as well that in some instances the government has elected to release Guantánamo detainees – even detainees classified as "enemy combatants" – in direct response to court orders requiring them to disclose information about the detainees or otherwise justify the legal basis for a detainee's continuing imprisonment on the merits.  *See, e.g.*, Dana Priest,

*Detainee Sent Home to Australia*, WASH. POST, Jan. 29, 2005, at A21 (Guantánamo detainee

Mamdouh Habib released after district court orders disclosure of classified court papers

concerning alleged plan by U.S. officials to render him to Egypt, where he had been previously

sent by U.S. officials and tortured during interrogation) (attached hereto as Exhibit B); Raymond

Bonner, *Australia Uneasy About U.S. Detainee Case*, N.Y. TIMES, Apr. 10, 2005, at 1 ("After

promising for more than three years that it would charge Mr. Habib, the Bush administration told

the Australians in January that it would not prosecute him because the C.I.A. did not want the

evidence about Mr. Habib being taken to Egypt, and his allegations of torture, raised in court,

Australian officials said.") (attached hereto as Exhibit C); *see also, e.g.*, *Al-Oshan v. Bush*, Civil

Action No. 05-CV-520 (RMU) (D.D.C.) (although request for factual return was denied,

government released petitioner to Saudi Arabia, where he remains imprisoned, shortly after

admitting he is not an enemy combatant). For this reason as well, because the government could

decide to render Petitioners rather than disclose additional factual information or attempt to

articulate a legal basis for their continuing detention, the Court should grant our request for the

government to provide at least thirty days' notice prior to rendering or otherwise releasing

Petitioners from Guantánamo.[2]

## II.    RESPONDENTS' ALTERNATIVE REQUEST FOR A STAY SHOULD ALSO BE DENIED IN LIGHT OF ADDITIONAL FACTS

We also draw the Court's attention to a recent hearing before Judge Robertson on

December 12, 2005 in *Qassim v. Bush*, Civil Action No. 05-CV-0497 (JR) (D.D.C.), which also

involves non-enemy combatant Uighurs who are detained with Petitioners in Camp Iguana. We

respectfully submit that Judge Robertson's conclusions at the hearing are relevant to the Court's

---

[2] Again, we do not seek an injunction barring Petitioners' release from Guantánamo. To the contrary, we seek their release to a country to be agreed upon with the government.

consideration of the government's pending request for a stay, and that in light of these conclusions the request for a stay should be denied.

By way of background, after a hearing on August 1, 2005, Judge Robertson directed the government to be prepared to make certain disclosures concerning the process and status of its efforts to relocate the *Qassim* petitioners. *See Qassim v. Bush*, 382 F. Supp. 2d 126, 129 (D.D.C. 2005). As set forth in our cross motion, the government represented to Judge Robertson at a hearing on August 25, 2005 – as it has represented in this case – that it had made certain efforts to find a suitable country to which to transfer the Uighurs, and the government explained those efforts to Judge Robertson in a sealed proceeding. *See* Schoeman Decl. Ex. B (hearing transcript) (Document #8-2); Resp'ts' Reply Mem. at 15-16 (Document #11).

At the recent hearing on December 12, 2005, however, Judge Robertson indicated that he was frustrated with the government's efforts to reach a diplomatic solution concerning relocation of the *Qassim* petitioners, and had lost faith in those efforts. In particular, Judge Robertson concluded that "[a]s far as I can tell, nothing is happening" with respect to the Uighurs held in Camp Iguana, three of whom again are Petitioners here. Hearing Tr. at 3, *Qassim v. Bush*, Civil Action No. 05-CV-0497 (JR) (D.D.C.) (attached hereto as Exhibit D).[3] Judge Robertson also stated:

> I am more interested today in the fundamental underlying question, which is the basic motion to vacate the stay order and issue a writ directing the immediate release of the petitioners. It is getting to be time, and it may be time now, to fish or cut bait on this motion. I think the premise on which I declined to decide this three or four months ago was that the government was making good faith efforts, and that something would happen, and that we were not thinking about indefinite detention of these people because the government wants them released. The time has stretched out to the

---

[3] Judge Robertson also commented that "the government, if it's making any progress at all, doesn't even want to tell me about it *ex parte*." *Id.*

KL3:2484900.3

> point where *indefinite is not an inappropriate word to describe*
> *what's happened*, and the question is whether I or anybody can or
> should tolerate that situation.

*Id.* at 6-7 (emphasis added). Judge Robertson therefore is now considering whether to order the

government to release the *Qassim* petitioners, and will issue a decision within two weeks:

> The one thing that I am sure of is that I'm going to act on this
> motion within the next week or two one way or another. There
> isn't going to be any more waiting. . . . if [the government] can tell
> me that they're going to be released on X date and you have a date,
> I'll accept that. But "diplomatic efforts are proceeding," no thank
> you.

*Id.* at 30.

In light of Judge Robertson's determination that the government's diplomatic

efforts to relocate the *Qassim* petitioners – who again are non-enemy combatant Uighurs that

were captured and sold to the U.S. military along with Petitioners in this case, and who are now

also detained in Camp Iguana – are plainly insufficient, if nonexistent, and that the Uighurs who

have been cleared for release have been held for far too long, we respectfully submit that it is

highly unlikely that Petitioners here will be released by the government without the Court's

direct involvement and supervision. In sum, if the Court were to grant Respondents' request for

a stay, it is very likely that Petitioners' detention would continue indefinitely despite their

exoneration. In this respect, after being imprisoned nearly *incommunicado* for four years, the

harm they would suffer from a stay would be irreparable.

## Conclusion

For all of these reasons, and for the reasons set forth in our prior papers, we respectfully request that the Court (i) consider the additional facts presented herein, (ii) deny Respondents' pending motion, and (iii) grant Petitioners' pending cross motion in its entirety.

Dated:    New York, New York
          December 16, 2005

Respectfully submitted,

Counsel for Petitioners:

/s/ J. Wells Dixon
Paul Schoeman (Pursuant to LCvR 83.2(g))
J. Wells Dixon (Pursuant to LCvR 83.2(g))
Joel Taylor (Pursuant to LCvR 83.2(g))
Alison Sclater (Pursuant to LCvR 83.2(g))
Michael J. Sternhell (Pursuant to LCvR 83.2(g))
KRAMER LEVIN NAFTALIS & FRANKEL LLP
1177 Avenue of the Americas
New York, New York 10036
Tel: (212) 715-9100
Fax: (212) 715-8000

- and -

Barbara Olshansky (NY-0057)
Tina Monshipour Foster (Pursuant to LCvR 83.2(g))
Gitanjali S. Gutierrez (Pursuant to LCvR 83.2(g))
CENTER FOR CONSTITUTIONAL RIGHTS
666 Broadway, 7th Floor
New York, New York 10012
Tel: (212) 614-6439
Fax: (212) 614-6499

KL3:2484900.3

# EXHIBIT A

BINGHAM McCUTCHEN

# Memorandum

Direct Phone: (202) 778-6172
Direct Fax:    (202) 778-6155
susan.manning@bingham.com
Our File No.: 0999997-0000928706

Bingham McCutchen LLP
Suite 800
1120 20th Street, NW
Washington, DC
20036-3406

202.778.6150
202.778.6155 fax

bingham.com

Boston
Hartford
London
Los Angeles
New York
Orange County
San Francisco
Silicon Valley
Tokyo
Walnut Creek
Washington

DATE:  December 2, 2005
TO:  Privilege Review Team
FROM:  Susan Baker Manning
RE:  **Kiyemba v. Bush**

**Mamet v. Bush**

**High Priority.**

I enclose four pages of correspondence in Uighur from non-enemy combatants Ayoub, Akthar and Ahmad. Per previous practice. I would appreciate it if you would make these available to Nury Turkel for translation, and then declassify his translation. Please don't hesitate to give me a call if you would like to discuss. Thank you.

Material Submission Form

**Identifying Data**

Submission Date                     Law Firm doing submission            Lawyer
12-2-05                             Bingham                              Sus Baker Maning

Docket Number/Case Name                                    Number of Pages
Qassim / Mamut                          4

**Type of Action Requested - Select Only One**

Classification Review ☐     Declassification ☑     Redaction Review ☐

Other ☑          Describe Other Action   non-enemy combattant letters
                                        for translation by Mary Turkel
                                                                    Thp!

**Type of Material**

Attorney Notes ☐     Detainee Letter ☑     Memorandum ☐
Form Letter ☐        ARB Submission ☐      Pleading/Filing ☐
Other ☐              If Other, Please Describe _____

**Format**

Handwritten ☑     Typewritten ☐
Other Format ☐    If Other Format, please describe _____

**Language Used - Mark as appropriate**

English ☐          Arabic ☐     French ☐
Other Language ☑   Identify Other Language   Uigur

FOR PRIVLEGE REVIEW TEAM USE ONLY

Tracking Number                    Date Rcvd

**FOUO**

November 12, 2005

My name is Ahtar and I am an innocent Uyghur who has spent last 4 years here in the US controlled military prison in Guantanamo Bay, Cuba. I arrived here in December 23, 2001. US government has declared that I am innocent after conducting various investigations about me. However, I am still languishing in this prison. In order to obtain earlier release and assure a fair treatment, I would like to ask Mr. Michael Sternhell to be my attorney. Therefore, I respectfully ask you to deliver this letter to Mr. Sternhell.

Sincerely,

Ahtar Qassim
ISN: # 276

November 8, 2005

To: Mr. Michael Sternhell

Dear Mr. Sternhell:

My name is Ahmat Adil and I am a Uyghur from East Turkistan. I have been imprisoned by the US government here in Guantanamo since December 23, 2001 and it has been 4 years since I arrived here.

On May 9, 2005, American military court declared that I am innocent and I have been waiting to be released ever since. However, I am still here in this prison since no country has yet agreed to accept me as a refugee.

In order to expedite my release, I respectfully ask Mr. Michael Sternhell to be my legal representative in all matters related to my case.

Sincerely,

Ahmat Adil (aka Ablikim Abdurusul)
ISN: #260

November 13, 2005

To: Mr. Michael Sternhell

Dear Sir,

My name is Ayup Haji Muhammed and I consider myself as someone who lost his human freedom for no reason. It has been 4 years since I have been imprisoned here in Guantanamo by the US government.

In order to assure my human rights and to obtain my earliest release, I would like to ask Mr. Michael Sternhell to be my legal representative.

Sincerely,

Ayup Haji Muhammed
ISN: #279

ISN: #260 – My current name is Ahmat Adil and I was known as Ablikim Abdurusul back in my country.

ISN: #279 – Ayup Haji Muhammed

INS: # 276 – Ahtar Qassim (also known as Niyaz Memet Qassim)

مەنكى ئە ختەر شۇيغۇر ـ ئامرىكا ھۆكۈمىتى باشقۇرۇشىغا ئستدىكى كۈبا
گۇۋەنتاناما تۇرمىسدە (لاگىرىدا) تۇت يىللا يېقىن ۋاقىت كۈن ئاسىز قا مەلىب
تۇرۇۋاتقان بىر بىگۇناھىمەن. (يەنى ٢٠٠١ ـ يىلىغى ھالاتقا بىلاق ٢٢ كۈندىن
قازرۇمىجە).. تۇۇناتسۇ تۇروب، قايتا ـ قايتا ئستقلاب تەكشۇرۇشلەر ئار قىلىق
بۇنىگدىن ئاب تىلكۇر، ئامرىكا ھەر بى ستوت ھەقىكىسى تەرىپدە سۇ
تۇۇناسۇز نگى ئلكىم ئىلان قىلىنقان بولىسىمۇ ئا كۇي قازرۇمىجە يەنىلا
تۇۇناسۇز تۇروب، سۇ يەردە قا مەلىب تۇرىۇۇ تقا ئلكىم تۇ ھىۇن ئۇۇزە نكگە
كا دوكا ت تە كاتب قىلسە ن ۋە ئستاللرنمنلاك ئاد ئانىق بماله ن بوتە رە ب
قىلىنسە، سۇ يەر د ىن تېۇ جىتسۇ ھەركىنلكتىن ۋە كىشىلالك صۇقۇ قىلاردىن قولۇق
بە ھرمە ن بولۇشنى ئالايمە ن.

شتۇۇنا بۇتە كىلسىنا يسى    MichAilSterhei    ئە بەندە بگە سۇ ردو م
                          ٢٧٦ ـ نومور                ٢٠٠٥ ـ ١١ ـ ١٢

**FOUO**

تەلەپناھە

ھۆرمەتلىك ستەنبىل كەپەندىگە !

مەنكى ئەخمەت ئادىل شەرقى تۈركىستانلىق، ئۇيغۇربولىمەن،
2001 - 12 - 23 كۈنىدىن بېرى ھازىرغىچە ( 4 يىل ) كۈبا تۈرمەسىدا
ئامرىكا تەرىپىدىن توتۇلۇپ تۈرۈلۈۋاتىمەن.

ئالتە ئاينىڭ ئالدىدا ( 2005 - 5 - 9 كۈنى ) ئامرىكىسىڭ ئەسكىرى سوتى
تەرىپىدىن گۇناھسىز دەپ ئىلان قىلىندىم.

شۇنىڭ بىرى چىقىشنى كۈتۈپ تۈرۈۋاتمەن.

ئەھما سىياسىي پاناغا ئالدىغان دەۋلەت بولمىغاچقا ھازىرمۇ تۈرمەدە
تۈرۈۋاتمەن.

شۇنىڭ ئۈچۈن مەن ئىشلىرىمىڭ تىزراق ھەل بولىشى ۋە تۈرمەدىن
تىزراق چىقىشىم ئۈچۈن مايكەل ستەنبىل ئەپەندىمسىزنى مىنىڭ
خاس ئادۇۋى ئافلۇغۇچىدم بولىسىزنى تەلەپ قىلىمەن.

ئەسكەرتىش ! - مىڭ ئەسلى، ئىسىم ئابلىكىم ئابدۇرۇسۇل.

( نۇ مۇرۇم 260 )

كۈنى 8 - 11 - 2005

**FOUO**

مايكل ستكل ئەپەندىگە ؛

مەن بولساڭ ئۇيغۇر دىماجى موشۇ مەدە، ئامرىكا ھۆكۈمىتى قول ئاستىدا
ئىنسان ھوقوقلىرىدىن تالماپەن، ئايرىلغان ن ھالدا كۆپ يا گۇۋەانتانامودا ٦ يىل قەدەر
ئىجىمى بىكگۇنا تۇتۇلۇپ تۈرۈلۋاتقان بىر ياشۇمەن ؛

سۈنلىك ئۇيغۇن كتىلدمى مەۇمۇقمى سۇئەراقلا ئىركىنلىكىنى
تىنرلەتتى مايتورىۋان ئىلستى ئۇيغۇن ئىۋۇزوەمككە سىياسى دۆ ئانۇنى ۋەككىلى
(ئاملئۇچىسى) ئىلستى خالا يىدن ؛

كۆلۇ ئەمىر
كۈسى ١١ . ١٣ .

**FOUO**



هارىرقى ئىسسىم ئەخىەت ئادىل

260 ← ۋەتەنداكى ئىسسىم ئابلكىم ئابدۇرۇسۇل



279 ← ئەيۇپ ھاجى مۆھەممەت

ئەخنەر قاسىم ←
276 ←
نياز مەمەت قاسىم →

**FOUO**

EXHIBIT B



washingtonpost.com    Hello jwdixonesq    PRINT EDITION | Subscribe to
Edit Profile | Sign Out    The Washington Post

NEWS | OPINIONS | SPORTS | ARTS & LIVING    DISCUSSIONS | PHOTOS & VIDEO | CITY GUIDE    CLASSIFIEDS | JOBS | CARS | R

SEARCH: ⦿ News ⦾ Web    [          ]    go    powered by YAHOO! SEARCH    Top 20 E-mail

Advertisement

washingtonpost.com > World > Americas > Caribbean > Cuba > Post

# Detainee Sent Home to Australia

Print This Article
E-Mail This Article

Advert



MOST VIEWED ARTICLES
World         On the Site

Updated 1:15 p.m. ET

• Bush Urges 'Patience' on
  Iraq
• Preserved Mural Unearthed
  in Guatemala
• Asian Leaders Agree to New
  16-Nation Association
• For Kurds, A Surge Of
  Violence In Campaign
• U.S. Envoy Calls Torture at
  Two Iraqi Prisons Severe,
  Extensive

*By Dana Priest*
Washington Post Staff Writer
Saturday, January 29, 2005; Page A21

Mamdouh Habib, an Australian citizen released from the U.S. military prison at Guantanamo Bay, Cuba, after more than three years, arrived in Sydney yesterday and was immediately freed by the Australian government. He boarded a small aircraft with his wife and child and flew to another location in the country.

A government spokesman said Habib, 48, whom U.S. authorities say they suspect of being an al Qaeda trainer, is unlikely to be charged with wrongdoing but will be kept under surveillance, in line with an agreement reached with the United States as a condition of release.

FEAT

• Olb
• Rita
• Sca
• Sig
• Sav
• NAS
• Law
  Defe
• $16
• For
• Refi
• Coo
• Cus

RSS NEWS FEEDS

Top News
Post
What is RSS? | All RSS Feeds

Habib's attorney, Joseph Margulies, who accompanied him on the flight, said Habib slept a lot and will soon seek treatment for physical and mental problems. He plans to spend time alone with his family, Margulies said.

Habib looked gaunt as he disembarked and shook hands with Australian officials at the airport. He has alleged that after his capture in Pakistan in October 2001, he was taken by U.S. officials to Egypt and tortured there during interrogation. He asserts that he confessed to halt the torture and was later taken to Bagram Air



enlarge photo

Mamdouh Habib arrives in Sydney after being released from the prison at Guantanamo Bay, Cuba. (Dan Peled -- AP)

— **Tsunami in South Asia** —



INDONESIA
Epicenter

**Casualty Map**
Track the path of destruction in an animated map and

Base in Afghanistan and then to
Guantanamo Bay in May 2002.

Three Britons released from the
same prison -- Rhuhel Ahmed,
Asif Iqbal and Shafiq Rasul --
have said Habib was in
"catastrophic shape" when he
arrived. Most of his fingernails
were missing, and while
sleeping, he regularly bled from
the nose, mouth and ears. They
said U.S. officials often denied
him treatment.

Habib, who was born in Egypt
and left when he was 18, moved
to Australia decades ago. He has
told his attorneys that he went to
Pakistan to find a home for his
family, which he wanted to have
a more Islamic lifestyle.

Habib's fate seemed to change
earlier this month when a U.S.
District Court ordered the disclosure of classified court papers
related to his effort to block what he believed was a U.S. plan to
transfer him back to Egypt. The papers revealed Habib's allegations
of torture in Egypt.

The Defense Department, with President Bush's approval, decided to
release Habib and four British detainees.

Margulies said Habib was unshackled during the trip and had been
allowed to change out of prison garb. But he said that Habib was
kept shackled for eight hours in a holding area before leaving. As he
waited, Habib told Margulies, a U.S. official informed him he was
being taken back to Egypt. Later, a military policeman whispered to
him that he was actually going to Australia, Margulies said.

The United States insisted that the Australian government charter an
airplane to take Habib home, at a cost of about $250,000.

Habib's sister, Sally Habib, told an Australian radio station that she
had spoken to him by phone before leaving for a family reunion: "I
just cry . . . I just want to see him and touch him and hug him and . . .
I'm so excited, but I know he needs a rest and he's happy now, and
I'm happy, too."

view updated casualty reports.

• **How to Help Victims**

————— **Rebuilding Weligama** —————

   **The Post's Dobbs**
writes of his own
experiences and
efforts to help rebuild
a Sri Lanka
community.

————— **On the Scene** —————

• **Photo Gallery: Return to School**
• **Photo Gallery: Tsunami Aftermath**
• **Satellite Images: Banda Aceh**

• **'Like a Scene From the Bible'**
The Post's Michael Dobbs describes his
experience in Sri Lanka.
• **Transcript: A First Person Account**
• **Video: Dobbs Recounts Experience**
• **More Tsunami Coverage**

Free E-mail Newsletters

   • **Today's Headlines & Columnists**
     See a Sample | Sign Up Now
   • **Breaking News Alerts**
     See a Sample | Sign Up Now

Print This Article     E-Mail This Article     Permission to Republish

© 2005 The Washington Post Company

Advertising Links                                                                      What's this?

**Save on All Your Calls with Vonage**
When looking for local regional and long distance calling, use Vonage to make calls to all
50 states and Canada. Get voicemail, great international rates and more. Sign up today.
www.vonage.com

**Mortgage Rates Hit Record Lows**
$160,000 loan as low as $633/month. Compare rates - refinance now.
www.lowermybills.com

**MyCashNow - $100 - $1,500 Overnight**
Payday Loan Cash goes in your account overnight. Very low fees. Fast decisions. Direct
deposit is not required. No credit check. Confidential - secure.
www.mycashnow.com





SEARCH: ⦿ News  ○ Web  [                    ]  go  powered by  YAHOO! SEARCH

NEWS | OPINIONS | SPORTS | ARTS & LIVING | Discussions | Photos & Video | City Guide | CLASSIFIEDS | JOBS |

**washingtonpost.com:** Contact Us | About Us | Work at washingtonpost.com | Advertise | Media Center | Site Index | Site Map
Archives | E-mail Newsletters | RSS Feeds | Wireless Access | Make Us Your Homepage | mywashingtonpost.com
**The Washington Post:** Subscribe | Subscriber Services | Advertise | Electronic Edition | Online Photo Store | The Washington P
**The Washington Post Company:** Information and Other Post Co. Websites

© Copyright 1996- 2005 The Washington Post Company | User Agreement and Privacy Policy | Rights and Permissions

EXHIBIT C

Westlaw.

The New York Times

4/10/05 NYT 110                                                        Page 1

4/10/05 N.Y. Times 110
2005 WLNR 5597965

New York Times (NY)
Copyright (c) 2005 The New York Times. All rights reserved.

April 10, 2005

Section: 1

Australia Uneasy About U.S. Detainee Case

RAYMOND BONNER

SYDNEY, Australia The Australian government, which has been one of the strongest
supporters of the Bush administration's policy on the detention and prosecution of
people suspected of being members of Al Qaeda, is growing uneasy with the handling
of the case of one its citizens who has languished in the prison camp at Guantanamo
Bay for more than three years.

In late March, the Australian ambassador to Washington went to the White House and
Pentagon to express concerns about the status of David Hicks, 29, who has been at
Guantanamo since January 2002, Australian and American officials said.

"We are very frustrated," a senior Australian official said. "The process is taking
much longer than people might reasonably have expected."

"We don't want this guy in limbo forever," he added.

Two years ago, the United States sought to dispose of the case by having Mr. Hicks
returned to Australia to face charges; the Australian government said that even
though he had trained with Al Qaeda, his activities were not in violation of any
Australian law at the time. It took an additional 18 months before the United
States, under pressure from the Australian government, filed charges against Mr.
Hicks, one of the few detainees formally charged.

Mr. Hicks, who initially cooperated with his interrogators, but stopped when he
realized it was not leading to his release, alleges that he has been tortured at
Guantanamo, that he has had his head slammed into the pavement while blindfolded
and that he has been offered the services of a prostitute.

The Australian ambassador, Michael Thawley, has also expressed concern that the
Bush administration may eventually drop the Hicks prosecution, either because it
does not have a strong case -- there is no evidence that Mr. Hicks shot at any
Americans during the war in Afghanistan, American and Australian officials have
said -- or because it is worried about what would come out in a trial.

Several Australian officials, from different agencies or departments, agreed to
talk about the Hicks case on the condition that they not be identified, because it

©  2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

touches on intelligence information and delicate diplomatic matters.

A Pentagon spokesman, Maj. Michael Shavers, said in an e-mail response to questions that the United States "has had fruitful discussions with the government of Australia." He declined to provide details, saying it was "inappropriate" for the Defense Department "to comment on the status of specific negotiations between the two countries."

He added that the Australians had previously said publicly that the military commissions "can provide full and fair trials and have consented to the United States bringing David Hicks to trial in military commissions proceedings."

Regarding Mr. Hicks's allegations that he has been tortured, Major Shavers said they "seem to fit the standard operating procedure in Al Qaeda training manuals."

Underlying the recent activity, and the concerns of the Australians in the Hicks case, is the case of another Australian detainee, Mamdouh Habib, who trained with Al Qaeda, was picked up in Pakistan a few weeks after the Sept. 11 attacks, and was whisked away by the C.I.A. to Egypt, where he says he was tortured before being taken to Guantanamo Bay.

After promising for more than three years that it would charge Mr. Habib, the Bush administration told the Australians in January that it would not prosecute him because the C.I.A. did not want the evidence about Mr. Habib being taken to Egypt, and his allegations of torture, raised in court, Australian officials said. Mr. Habib was returned to Australia, and is now a free man, though closely monitored by Australia's domestic intelligence agency.

Contributing to the pressure on Prime Minister John Howard and his government to do something for Mr. Hicks is the view that Mr. Hicks is less culpable than Mr. Habib, and that if Mr. Habib is free than surely Mr. Hicks should be.

An Australian official who investigated the Hicks and Habib cases, described Mr. Hicks as "a bit of a fool, naive." Another official described him as a "young kid looking for adventure." The C.I.A. and Pentagon consider Mr. Hicks less of a potential terrorist threat than Mr. Habib, Australian officials said.

Mr. Hicks, who grew up in Adelaide, was expelled from school when he was 14 and began drifting, skinning kangaroos in the Australian Outback and training horses in Japan. In 1998, he decided he would join the Kosovo Liberation Army in the war against Slobodan Milosevic. The war ended soon after he got there.

Back in Adelaide, Mr. Hicks attended Bible study classes at an evangelical church, and when that did not bring him whatever he was looking for, he started going to a mosque. Soon, he headed to Pakistan, where he joined Lashkar-e-Taiba, a guerrilla group that had the backing of the Pakistani Army in the conflict against India over the disputed territory of Kashmir.

At some point, he went to Afghanistan and trained at Al Qaeda camps. He was the most highly trained Caucasian, an Australian official said in a recent interview.

He was in Afghanistan when the United States invaded after the Sept. 11 attacks. He was captured by the Northern Alliance and turned over to the Americans, presumably for a substantial reward, Australian officials have said.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

At Guantanamo, Mr. Hicks says, he was beaten "before, after and during interrogations," and while blindfolded and handcuffed.

"I have had my head rammed into asphalt several times (while blindfolded)," he said in an affidavit he signed last August.

"Interrogators once offered me the services of a prostitute for 15 minutes if I would spy on other detainees," he wrote. "I refused."

Australian officials have said they have received reassurances from the Americans that Mr. Hicks has not been mistreated.

Prime Minister Howard has been one of President Bush's most steadfast allies since Sept. 11. He has sent troops to Afghanistan and Iraq, and his government has accepted the legitimacy and fundamental fairness of the military tribunals, which most other Western democracies -- most notably Britain -- have not, and Australian officials looked the other way when the C.I.A. took Mr. Habib to Egypt.

Australian officials are reluctant to speak harshly about the Bush administration, but at the same time they recognize the need to act to protect the rights of an Australian citizen.

"We have an ongoing concern about how long this has taken," one official said. "This is a classic case of 'justice delayed is justice denied.'"

                    ---- INDEX REFERENCES ----

NEWS SUBJECT:  (Government (1GO80))

INDUSTRY:  (Aerospace & Defense (1AE96); Defense (1DE43); Defense Intelligence (1DE90); Defense Policy (1DE81))

REGION:  (North Africa (1NO44); Southern Asia (1SO52); North America (1NO39); Latin America (1LA15); Cuba (1CU43); Africa (1AF90); Pakistan (1PA05); Indian Subcontinent (1IN32); Egypt (1EG34); Western Asia (1WE54); Afghanistan (1AF45); India (1IN24); Americas (1AM92); Asia (1AS61); Mediterranean (1ME20); Australasia (1AU56); USA (1US73); Australia (1AU55); Oceania (1OC40); Caribbean (1CA06))

Language:  EN

OTHER INDEXING:  (AUSTRALIA; AUSTRALIA UNEASY; AUSTRALIANS; BIBLE; DEFENSE DEPARTMENT; KOSOVO LIBERATION ARMY; PAKISTANI ARMY; PENTAGON; US DETAINEE; WHITE HOUSE)  (Al Qaeda; Bush; David Hicks; Habib; Hicks; Howard; Interrogators; John Howard; Lashkar-e-Taiba; Major Shavers; Mamdouh Habib; Michael Shavers; Michael Thawley; Prime; Slobodan Milosevic)

EDITION: Late Edition - Final

Word Count: 1302
4/10/05 NYT 110


END OF DOCUMENT

                © 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

©  2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT D

1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ABU BAKKER QASSIM, et      :    Civil Action No. 05-0497
al.,               :
                   :   December 12, 2005
     Plaintiffs,     :
v.             :
               :   2:30 p.m.
GEORGE BUSH, et al.,     :  . . . . . . . . . . . .
     Defendants
. . . . . . . . . . . . . . . .

TRANSCRIPT OF STATUS CONFERENCE
BEFORE THE HONORABLE JAMES ROBERTSON
UNITED STATES DISTRICT JUDGE

APPEARANCES:
For the Plaintiffs:    P. SABIN WILLETT, ESQUIRE
              BINGHAM McCUTCHEN, LLP
              150 Federal Street
              Boston, Massachusetts  02110-1726
              (617) 951-8684
              SUSAN BAKER MANNING, ESQUIRE
              BINGHAM McCUTCHEN, LLP
              1120 20th Street, NW
              Suite 800
              Washington, D.C.  20036-3406
              (202) 778-6172

For the Defendants:    TERRY M. HENRY, ESQUIRE
              U.S. DEPARTMENT OF JUSTICE
              CIVIL DIVISION
              20 Massachusetts Avenue, NW
              Room 7144
              Washington, D.C.  20530
              (202)514-4107

Court Reporter:      REBECCA KING, RPR, CRR
              Official Court Reporter
              Room 4802-B, U.S. Courthouse
              Washington, D.C. 20001
              (202) 898-9398

Proceedings reported by machine shorthand, transcript produced

by computer-aided transcription.

2

1       P R O C E E D I N G S
2       COURTROOM DEPUTY:  Civil action number 05-0297, Qassim
3  versus Bush.  Sabin Willett present for the plaintiff, and Susan
4  Manning, Terry Marcus Henry present for the defendant.
5       THE COURT:  Good afternoon, everybody.  There are two
6  recent pending motions in this case; one is for an order
7  amending the access procedures for counsel under the protective
8  order, the other is for access by the petitioners to
9  representatives of the United Nations Commission on Human
10  Rights.
11       I issued a memorandum order nearly four months ago in
12  this case laying out what seemed to me then and still seems to
13  me to be a genuine dilemma.  The petitioners in this case are
14  two Uighurs, ethnic Chinese Muslims from the western part of
15  China.  They were apprehended somewhere in Afghanistan or
16  Pakistan, taken to Guantanamo Bay, held at Guantanamo Bay as
17  combatants for a long time, then went through the Combatant
18  Status Review Tribunal procedure, and at some point declared to
19  be, quote, "no longer enemy combatants," closed quote, a term of
20  art invented by the military at Guantanamo to describe people
21  who are not enemy combatants, without admitting or denying that
22  they ever were enemy combatants to begin with.
23       The government says it has no place to send them.  At
24  an early hearing in this matter I pressed the government for
25  what power it had to hang on to them even another day longer,

3

1  and the best that Mr. Henry could come up with at the time was,
2  quote, "The executive's necessary power to wind up wartime
3  detentions in an orderly fashion," closed quote.  That's the
4  government's power for hanging on to these people.
5       I issued a memorandum order, as I said, nearly
6  four months ago on August the 19th declining to decide whether
7  the government really had such a wind-up power, because the
8  parties were in agreement that both Hakim and Qassim should be
9  and would be released.  But that hasn't happened.  As far as I
10  can tell, nothing is happening.
11       My first instinct when I heard this case was I didn't
12  want to hear ex parte representations from the government.  I
13  didn't really want to have a public/private part of this, and my
14  suspicions, my instincts were correct for reasons that I didn't
15  expect.  They were correct because what I heard ex parte wasn't
16  any different from what I was hearing in the courtroom.  There

17  isn't any -- the government, if it's making any progress at all,
18  doesn't even want to tell me about it ex parte.
19       So the petitioners insist that I should follow the
20  literal language of the habeas statute, 28 U.S.C. 2243, and
21  recently they have urged that I do so before Congress amends the
22  habeas statute, and order their bodies produced here for a
23  hearing. The government has opposed that suggestion all along,
24  arguing first that the scope of the habeas writ is still
25  undecided by the Court of Appeals, and second that in any event,

4

1  only the executive can say who enters the United States.
2       The most recent information I have from counsel about
3  their clients is that they met with their clients at Guantanamo
4  on November the 16th, that conditions are essentially unchanged,
5  that in the words of, I think, Ms. Manning's affidavit, they
6  have television but no reception, no radio, no telephone, cut
7  off from the world.
8       Now, let me address the two most recent pending
9  motions. The first is the motion for access to the UNCHR
10  representatives. The government first says, well, it's moot.
11  The motion was filed on the 15th; counsel went down there on the
12  16th, they had their meeting. The motion was that they be
13  permitted to go with counsel. The mootness point is rejected.
14  It's not moot, if for no other reason than hopefully counsel
15  will have access to go down there again.
16       The government's more important argument is that the
17  petitioners don't have any authority for the motion that they
18  make, which I think is a correct -- I think they're correct on
19  that proposition. I also think they're correct that an order
20  like that would, in the words of several Supreme Court cases,
21  embarrass the executive in the conduct of foreign relations and
22  interfere with the executive foreign policy role. So the motion
23  for access to the UNCHR representative must be and will be
24  denied. That's the motion number 44.
25       The motion to amend the access procedures asked for an

5

1  overhaul of the protective order which petitioners say is built
2  on the faulty premise that they are dangerous people.
3  Petitioners want to reverse the presumption that all
4  communication with the petitioners are classified, they want to
5  allow non-citizens who would otherwise be eligible for clearance
6  to visit with the detainees, they want to allow counsel to
7  provide petitioners with written materials, letters, books,
8  newspapers, magazines, photographs of their children, electronic

9    materials, et cetera.
10         They want a seven-day turnaround for mail instead of
11   having mail disappear into a black hole someplace, they want to
12   allow faxes, they want to allow visits by counsel to Camp
13   Iguana, I think it is, where the detainees are housed, instead
14   of in Camp Echo in chains.
15         They want the government to pay for travel and
16   accommodation costs of counsel visits, since the government
17   won't produce them in the United States; they want to provide a
18   telephone line that will allow access to calls to and from
19   counsel, family, and friends; and they want to allow the
20   petitioners to be recorded, video and audio tape, so that other
21   countries -- so that their family will know that they're safe.
22         I will hear some argument on this point, but I want you
23   to know before I hear it that I'm more interested in another
24   part of this, which I'll get to.  Because it isn't that I'm not
25   interested in this subject, it is first that this court has

6

1    decided, as a court, that issues relating to the protective
2    order should be handled by Magistrate Judge Kay.  I could carve
3    this case out of that, but I'm a little reluctant to do that.
4          And furthermore, I just, as a matter of judicial
5    philosophy, don't think that judges ought to get into the nuts
6    and bolts, the daily details of managing individual detainees,
7    prisoners, prisons, schools, institutions, anything else.  We're
8    not managers, we're not on the ground, we don't know the
9    situation in Guantanamo Bay.  The Defense Department has enough
10   problem enforcing the security regulations it has for everybody
11   without having to start making exceptions in individual cases.
12   It doesn't seem to me like a subject that frankly is fit for the
13   fashioning of decrees from Washington that will govern what
14   happens in Guantanamo.
15         I am more interested today in the fundamental
16   underlying question, which is the basic motion to vacate the
17   stay order and issue a writ directing the immediate release of
18   the petitioners.  It is getting to be time, and it may be time
19   now, to fish or cut bait on this motion.  I think the premise on
20   which I declined to decide this three or four months ago was
21   that the government was making good faith efforts, and that
22   something would happen, and that we were not thinking about
23   indefinite detention of these people because the government
24   wants them released.
25         The time has stretched out to the point where

7

1  indefinite is not an inappropriate word to describe what's
2  happened, and the question is whether I or anybody can or should
3  tolerate that situation.  And if it's intolerable, what I or
4  anybody else can do about it.
5       From the standpoint of the petitioners at Guantanamo
6  Bay, it clearly is intolerable.  It seems to me that I basically
7  have three options.  There's a fourth option, and the fourth
8  option is let's wait a few more months, and I don't frankly
9  think that's an option.  I think we've had enough time.
10      I think I have three options.  The first is to deny the
11  petition for habeas corpus because I don't have any power to do
12  anything, and at least free Mr. Hakim and Mr. Qassim to go to
13  the Court of Appeals with an appealable order; the second is to
14  follow petitioners' suggestion that I order, in the words of the
15  statute, the bodies of Mr. Hakim and Qassim - the living,
16  breathing bodies, I hasten to say - before this court so we can
17  have a hearing on the motion for their immediate release.  The
18  third is simply to order them released and see what happens, see
19  how the government responds to it.
20      The government has its own set of options.  It could,
21  as the petitioners suggested from the get-go, release them into
22  the general population at Guantanamo Bay.  It refuses to do
23  that, and I declined to order them to do that.  It could release
24  them, and I have to put the "release" in quotations, to the
25  detention facility which exists, as I understand, on the same

8

1  Guantanamo facility where there are other stateless persons or
2  persons who cannot be relocated wandering around in some state
3  of freedom.
4       It could bring them here in something like the status
5  of the Cuban Mariel boat prisoners, it could send them back to
6  China.  I don't know what other options the government has, but
7  the government -- such an order, an order simply to release
8  them, would put it to the government as to how to release them
9  and where to release them.  But, of course, since the government
10  already accepts the proposition that they should be released,
11  you might say that the government considers itself already under
12  that order.  It's a self-imposed order, it just doesn't know how
13  to do it.
14      Moving back to the second option, bring them here, the
15  government has made a number of arguments why I cannot do that,
16  because it would violate a whole line of cases making clear that
17  the courts have no authority to overrule exclusion orders.
18  This, of course, is not such a case, and an order to bring them
19  here under the authority of the habeas statute would not violate

20  or reverse an exclusion order, it would simply provide that the
21  Uighur petitioners would have to be brought here to this
22  courthouse in some sort of legal fictional bubble that would --
23  that lawyers and judges have been inventing for centuries.  The
24  fact that their feet touch the ground in the United States has
25  no significance, if, as a matter of law, they are deemed, as the

9

1  Mariel boat people are deemed, never to have arrived in the
2  United States.
3          But my problem -- so I think I could do that.  My
4  problem with that alternative, that middle alternative of the
5  three, is that I can't see where it goes from there.  The
6  petitioners suggest that I would then hold a hearing to make a
7  determination whether the petitioners are, as the government
8  insists that they are, maybe no longer enemy combatants, but not
9  necessarily nice people and dangerous people, and that I would
10  then make a determination as to whether they should be released
11  to the general population in this country.
12          And that is where I have a real issue as to whether I
13  have the legal power to do it.  I would bring them to this
14  country and have a hearing, but I don't see that I've got power
15  to carry out the result of the hearing.
16          So the word "dilemma," which is, I think, a Greek word
17  that implies a problem that has no obvious solution, applies
18  perfectly, I think, to the situation that's before me.  The one
19  thing I am sure of is that one way or another, one side or
20  another has to have an appealable order, and that for the matter
21  to remain pending before me does no service to anybody, since
22  obviously in some sense I'm just a weigh station to the Court of
23  Appeals anyway.
24          Now, I invited you in to argue and I've been doing all
25  the talking.  Mr. Willett, I would like to hear from you.

10

1          MR. WILLETT:  Good afternoon, Your Honor.
2          THE COURT:  Good afternoon.
3          MR. WILLETT:  Let's start with option one.  That's the
4  one where you deny our petition.  The one thing that I think is
5  easiest to resolve in this dilemma is option one, because if we
6  ignore all the metaphysicians who have been arguing about what
7  Rassoul means and we go to what they told me in law school I'm
8  supposed to read, which is the mandate, the order, the order in
9  Rassoul is in the last sentence:  "We reverse the judgment of
10  the Court of Appeals and remand for the District Court,"
11  footnote, not a lieutenant colonel somewhere, "the District

12  Court to consider in the first instance the merits of the
13  petitioners' claims."  And they dropped a footnote to make
14  clear, merits doesn't mean test the pleadings, merits means what
15  we all know it means.  It means facts.
16      So in a precisely parallel case, with the exception
17  that we didn't have the government's concession in that case
18  that in fact they're not enemy combatants, everything else is
19  parallel.  We know that Your Honor has jurisdiction to decide
20  the case, and so we're back to -- I don't think you've decided
21  this, but I think we've talked about, is there a lawful basis
22  for detention.  There is none.  If that is Your Honor's finding
23  and ruling, then I don't see how you could deny the petition for
24  habeas corpus.
25      So we go to options two and three.  Now, you might

                                    11
1  wonder why I don't leap at option three, and it's because I
2  think the most measured, the most legally clear course lies
3  through option two, the one where you bring them here for
4  another hearing where they're present.  And that's because we
5  can begin with a statute that makes the production of the body
6  mandatory, that says that the jailer shall produce the body.
7  All you're doing is applying an act of Congress.  I don't think
8  anybody could question this court in a case where the Supreme
9  Court has said you have jurisdiction, and an act of Congress
10  says that the presumption is that the bodies shall be produced.
11  No case ever says that the bodies shall not be produced.
12      So to go just to that limited next step of we're all
13  here with the petitioners present, there's no conceivable legal
14  challenge that I could think of to that.
15      So then where do we go?  Well, then we are in a dilemma
16  where the courts have actually been before in the somewhat
17  analogous situation of deportation; what do you do when the
18  Attorney General rightly wants to deport someone but no one will
19  take them?  And Zadvadus is that case.
20      Now, Zadvadus is a case where we've got a pretty
21  seriously bad guy, we have a career criminal, convicted thug.
22  He's been convicted of everything from attempted burglary to
23  possession of cocaine.  He's got a long rap sheet, and so Latvia
24  doesn't want him and Germany doesn't want him back, and they
25  have nowhere to send him.

                                    12
1      Even in that case, says the Supreme Court, you can't
2  hold him in prison indefinitely.  You've got to fashion some
3  kind of release until the day they find a Latvia or a Germany to

4    take him.  So we get to that interim step in option two where
5    the men are present.
6         We're kind of in that deportation situation where
7    Mr. Henry wants to effectively deport our clients, but there is
8    no appropriate country to take them.  I hesitate to add, they
9    are in no way, shape, or form criminals.  There's no accusation
10   of any wrong-doing.  They're just unfortunates.
11        So then where do we go?  Where we go is a very small
12   step, and that is to the interim release; in effect the parole
13   that Baker v. Sard and Mapp v. Reno spell out.  The idea is that
14   the habeas case is not over; Your Honor retains jurisdiction of
15   it, and one day when Mr. Henry can report that indeed they have
16   lined up Holland or Sweden or someone to take these men as
17   refugees, there's a case, they have to report to you, and
18   ultimately, in effect, they will be deported.
19        But the question is in the interim period what we do
20   with those men is we order some set of conditions that's
21   appropriate for release.  Mapp and Baker talk about this, and
22   it's probably a scenario that Your Honor is familiar with, more
23   familiar than I in criminal cases.  So perhaps they need to
24   report on a regular basis to the United States Marshal Service,
25   perhaps there are limitations on travel, perhaps you need to be

                                  13
1    assured as to where they're going to be housed and how they're
2    going to work and be fed and things like that, all of which we
3    can do.
4         The case isn't over.  It's still your case.  And as I
5    say, if it takes Mr. Henry another year to solve this
6    diplomatically, ultimately it gets solved that way.
7         THE COURT:  Well, I don't want to excessively
8    pigeonhole these cases, Mr. Willett, but Baker vs. Sard is a
9    criminal case.
10        MR. WILLETT:  Indeed.
11        THE COURT:  In a criminal case in the United States, a
12   criminal defendant has a constitutional right to bail, which is
13   constrained, powerfully constrained, by the Bail Reform Act, and
14   as a concession to the constitutionality of the right to bail,
15   Congress enacted this whole structure giving an accused person a
16   right to be released on appropriate conditions.  Neither Qassim
17   nor Hakim is an American citizen, they're not accused of crime.
18   The Bail Reform Act doesn't apply.  If you got them into this
19   courtroom and then argued to me that they had a right to be
20   released, I would ask you where that right comes from.
21        MR. WILLETT:  And Your Honor, I would say, as I think
22   the Court of Appeals said in Baker, it is inherent in the common

23  law writ, quote, "When an action pending in a United States
24  court," that's what we have, "seeks release from what is claimed
25  to be illegal detention," we have that, "the Court's

14

1  jurisdiction to order release as a final disposition of the
2  action includes an inherent power to grant relief pendente lite
3  to grant bail or release pending determination of the merits,"
4  not, I believe, linked to any statutory right of bail or even to
5  any constitutional right.
6      THE COURT:  Yeah, except that the defendant is
7  presumably putatively an American citizen already on American
8  soil.
9      MR. WILLETT:  Perhaps.  Although at least that was not
10  expressly necessary to the Court's reasoning in Baker.
11      Then if you go to Mapp, where you have an alien case,
12  not a citizen, a case that's more akin to what we have here,
13  where they are seeking to deport, I think to Tobago, a resident
14  alien, the Court again reviews authorities from the fifth
15  circuit, from this circuit, and concludes that you have that
16  inherent power as a part of your power as the habeas judge to
17  enter that relief.
18      And I think it fair to say, Your Honor, that the
19  Supreme Court has also noted that habeas is a flexible remedy,
20  one in which courts are encouraged to cut through the forms, I
21  think as Holmes said, to the tissue of the matter, and find a
22  way to alleviate the essential wrong, which is the unlawful
23  imprisonment.
24      I was going to start today by talking about what we're
25  observing in our clients.  I think Your Honor captures it from

15

1  our papers, but we have proceeded from what was almost elation
2  on their part in August after long years of, as one of them
3  said, feeling like he had evaporated from the world - all of a
4  sudden there were hearings and lawyers, things were happening -
5  we've proceeded from elation to frustration.  And that's
6  natural, and it's our job as lawyers to try to explain things to
7  our clients.
8      But I'm deeply concerned about the human impact of the
9  indefinite nature of this, and I do think that the remedy we ask
10  for is a limited one.  As you say, it adds nothing to whatever
11  right they have today with respect to asylum.  I mean, if they
12  have a right today to say that Rassoul's jurisdictional holding
13  gives them an entry to make an asylum petition, which I'm sure
14  Mr. Henry would say they don't, they're not going to get that

15  right because as an interim basis of habeas relief they've been
16  released from the prison.  I think they'll have whatever rights
17  they have today.
18          In any event, as I understand asylum, it's
19  discretionary anyway, so we're only talking about whether they
20  have standing to make an asylum petition.  And then if there was
21  some basis for exercising discretion to deny it, the government
22  would do that.
23          So as a practical matter, I don't see how the interim
24  release while we wait for this diplomatic solution really causes
25  much problem to the government, and it's the only thing anyone

                                16
1  has been able to come up with that alleviates this really
2  pressing harm that they're suffering.
3          I should say, Your Honor, yesterday I sat in church,
4  and it occurred to me that yesterday my clients entered into
5  their fifth year of incarceration.
6          THE COURT:  That's hard to imagine.  Well, see, you've
7  got them in here -- I've postulated bringing them in here in
8  some legal cocoon --
9          MR. WILLETT:  Whatever Your Honor orders.
10         THE COURT:  -- but you say once they're here, they can
11  petition for asylum?
12         MR. WILLETT:  I think that's the government's concern.
13         THE COURT:  Well, it's your intent, too, is it not?
14         MR. WILLETT:  Your Honor, I don't have an intent beyond
15  getting beyond this hearing and getting them out of Guantanamo.
16         But the fact of the matter is if we're a year from
17  today and they're existing in a kind of parole limbo in the
18  U.S., I mean, someone is going to have to figure out what to do.
19  And I suppose --
20         THE COURT:  Well, what if they're in parole limbo in
21  some detention center someplace?  How would you feel about that?
22         MR. WILLETT:  I don't think we would like that very
23  much.  I mean, that doesn't solve the problem of --
24         THE COURT:  Or if they're in parole status with the
25  Mariel boat people?

                                17
1          MR. WILLETT:  Your Honor, it's a continued
2  incarceration.  It doesn't solve the problem.
3          THE COURT:  So when you say you want them brought here,
4  what you're saying is you want them brought here and released?
5          MR. WILLETT:  Well, yes.  What I want is the
6  opportunity to show you conditions of release, of interim

7  release, which will satisfy you that there's no danger or harm
8  to anyone and no risk that the government's ultimate effective
9  deportation could be achieved as long as it's not back to China.
10      I can bring into this courtroom resident alien Uighur
11  expatriates who have offered us bedrooms for these men, who have
12  offered us jobs, who have called us on the phone to say how can
13  we help.  We can show you -- we can't have a hearing without
14  them coming, frankly, Your Honor.  We can show you a community
15  of people who can make this work at a practical level, and leave
16  Your Honor with the power to allow for the ultimate
17  deportation --
18      THE COURT:  Now, this hearing that you postulate,
19  you're going to show me conditions.  Is the government not going
20  to want to demonstrate why these people should not be released?
21      MR. WILLETT:  I don't have any doubt that they'll want
22  to do that.
23      THE COURT:  I mean, you've moved to strike the
24  affidavit of, what was it, General Hood?
25      MR. WILLETT:  I did.  Well, General Hood made

18

1  statements about what they were doing in Afghanistan, and no one
2  can cross-examine General Hood.  He wasn't in Afghanistan.
3      I don't care whether you strike the affidavit or not.
4  But if my clients were here, they could tell you what they were
5  doing in Afghanistan, and it had nothing to do with the Taliban.
6  Which is all sort of academic in light of the NEC finding.
7      But the point is, if they're here, they can address any
8  of these sort of innuendoes, I think as they put it, that
9  they're not benign people.  I think that's what it said.  If
10  that's a concern for the Court, we want to be able to address it
11  with the real guys.
12      THE COURT:  Well, all of that begs the question of
13  whether even if I thought they were the sweetest guys in the
14  world, I would have the power to order them released into
15  American society under any circumstances or any conditions.
16      MR. WILLETT:  Well, I think it clear you do.
17      THE COURT:  What I need from you is what your best case
18  is for the proposition that you think I have the power to do
19  that.
20      MR. WILLETT:  The first case is Rassoul, which says you
21  have jurisdiction to decide the merits.  Well, the merits of a
22  habeas case is, are we opening the jail or not.
23      THE COURT:  Well, the only merits that are left to this
24  case, as I understand it, is the merits of the government's
25  assertion that their power to hang on to them at Guantanamo is

19

1  the power to orderly wind up a war.
2       MR. WILLETT:  Right.
3       THE COURT:  That's a legal question.
4       MR. WILLETT:  Well, I mean, Your Honor will make a
5  ruling on that.  And if you find, as we've urged, that there is
6  no such power, then you would issue a ruling --
7       THE COURT:  Then I'm right back where I started from.
8  Then I would issue a ruling saying what?
9       MR. WILLETT:  That they have to be -- well, what you
10  would do is we would suggest that you would grant these interim
11  conditions of release until such time as the ultimate
12  resettlement is arranged.
13       So Rassoul, first case.  Second case --
14       THE COURT:  Well, the dichotomy here is release from
15  custody in Guantanamo Bay is one issue; release them on American
16  soil where they then encounter rights to asylum and whatever
17  else is another question.  You see those as the same issue?
18       MR. WILLETT:  I think that once the Supreme Court says
19  you have jurisdiction over their case, they're here.  They're in
20  this courtroom.  So if the order is for release, then I think
21  it's that door we all walk out of, and we figure it out from
22  there.  I don't think it's you bringing them here; I think
23  they're here.  They're here because the government brought them
24  to Guantanamo, and all you can do, as Holmes said, is ignore the
25  forms and cut through the tissue.  And the tissue here is --

20

1       THE COURT:  You Boston guys keep quoting Holmes to me.
2       MR. WILLETT:  Well, he seems to age well, Your Honor.
3       But the point is, we look for a practical solution.
4  And when we talk about this interim release, it really is a very
5  limited solution; you still have the case, someone can run in
6  here and say there's a parole violation, and, in fact, if I
7  don't persuade you at that hearing that conditions for interim
8  release are appropriate, I suppose back they go to Norfolk and
9  Guantanamo.
10       THE COURT:  Let's see.  I want to give Mr. Henry a
11  chance to talk before it gets too long here, but if I see
12  there's a parole violation, the probation department isn't going
13  to have jurisdiction over these people, pretrial services isn't
14  going to have jurisdiction over these people.  Who oversees this
15  parole we're talking about?
16       MR. WILLETT:  Well, there is not an elaborate
17  jurisprudence of parole in habeas cases, it's true.  We're all

18  kind of making this up as we go along.  But I suppose in the
19  worst case you suspend the release.
20        THE COURT:  Okay.  Thank you, Mr. Willett.
21        MR. WILLETT:  Thank you, Your Honor.
22        THE COURT:  Mr. Henry?
23        MR. HENRY:  Thank you, Your Honor.  As Your Honor has
24  recognized, there are a number of difficult issues associated
25  with this case, and I'm happy to talk about them.  I think the

                                21
1  legal landscape is a little more cut and dry than Mr. Willett
2  would make it seem.
3        But I did want to inform the Court that the diplomatic
4  efforts with respect to potential resettlement of the Uighurs is
5  ongoing, and we are prepared to report to the Court in camera as
6  to the progress of those efforts if you want to hear them.
7        THE COURT:  The only report I want is if they've been
8  released.  If you can't make that report to me, I don't want it
9  in camera.  The last time I heard a report in camera -- I don't
10  want to be in that position.  I just don't want to be in that
11  position.  As I say, it's time to fish or cut bait.
12        MR. HENRY:  Well, Your Honor, as you know, the
13  diplomatic situation does involve issues that we are not -- it's
14  not appropriate to discuss on the public record.  And so we make
15  the offer for Your Honor to hear an in camera report with
16  counsel, and should you change your mind on that, we're happy to
17  provide that.
18        But as to the legal landscape here, I think it is much
19  more straightforward than counsel would have you believe.
20  Counsel made the statement that we're all kind of making this up
21  as we go along.  Actually, that's not the case, Your Honor.  As
22  Your Honor previously indicated, our position is, of course,
23  that the Court does lack the authority to bring the petitioners
24  to the United States.
25        And I would point out that currently the petitioners

                                22
1  are not in the United States.  According to the immigration
2  statutes, the United States is defined specifically, and it does
3  not include Guantanamo Bay.  That's 8 USC 1101(A)38, where the
4  U.S. is defined for purposes of entry, exclusion, deportation,
5  all those kind of things.
6        And so what this case is, it's not a deportation
7  situation, it's not a removal situation.  It does not involve a
8  statutory situation as was involved in the Zadvadus case, but
9  rather the question of bringing the petitioners here involves a

10    question of entry into the United States.
11        And there is a Supreme Court case that is as close as
12    we've found to be on point.  It's Shaughnessy vs. Mezei,
13    345 U.S. 206 from 1953.  That case involved an alien who had --
14    who was refused entry into the United States, and according to
15    the Court, he was stranded - and the Court used that term,
16    "stranded" - on Ellis Island for it looks like, reading the
17    opinion, a matter of years, because other countries would not
18    take him.
19        The question before the Supreme Court was whether
20    habeas would afford the detainee some sort of relief, whether
21    his continued indefinite detention there on Ellis Island was
22    unlawful so as to permit his entry into the U.S. temporarily on
23    bail, if you would, pending the government's efforts to find a
24    place for resettlement for him.  The answer there was clearly
25    no.

23

1        And as I said, that case seems to be the most analogous
2    to this case, far more analogous than a Zadvadus type case that
3    involves deportation or removal, where there are specific
4    statutes governing the situation.
5        And as we've pointed out in our briefs back in August
6    on this, there's a long line of case law as well as statute
7    saying that entry into the United States is an executive matter,
8    it's a decision, a discretionary decision, that is reserved to
9    the executive, and Congress has specifically precluded judicial
10    review even through habeas with respect to those discretionary
11    decisions regarding the entry of an alien into the U.S.
12        But beyond the situation of the power of the Court to
13    do as the petitioners request and bring the petitioners here for
14    some sort of hearing, I think if you take a look at the legal
15    standards in the cases that the petitioner cites - for example,
16    the Mapp case - and if you kind of get beyond the analogies or
17    general principles that the petitioners argue and look at the
18    actual legal standards that apply in a request for interim
19    release in a habeas context, like I said in Mapp, you'll see
20    that in order to attain interim release, number one, that relief
21    under Baker vs. Sard is tied to the Court's ultimate authority
22    to award whatever the final relief would be.  And I think Your
23    Honor reflected that there were some serious issues with that.
24        But even beyond that, on the question of interim
25    release, under the Mapp case you have to have a showing of

24

1    extraordinary circumstances, and the interim relief, the release

2  on bail, whatever you want to call it, has to be necessary to
3  make the final habeas remedy effective.
4          And what that means is a situation such as in a case
5  called Boyer vs. City of Orlando, which 402 f 2nd, 966. It's
6  the fifth circuit, 1968. There you had a petitioner who had
7  been sentenced to a 120-day sentence; the Court ordered interim
8  relief because it was going to take a lot longer than 120 days
9  for his habeas petition to be resolved. In other words, his
10  case would have been moot before it could have been heard, so
11  the Court decided that interim relief was appropriate. But we
12  don't have anything like that here.
13          And again, I think Your Honor hit on the point, you've
14  got to think about what the purpose of such a hearing would be
15  and what the end game would be. The legal cocoon idea that was
16  floated a little bit earlier, I think there's serious question
17  as to whether the Court would have the power to create such a
18  cocoon. We certainly would have some arguments, you know, with
19  respect to that, but the statutes in the immigration context are
20  almost always keyed on the presence of an individual within the
21  United States.
22          So were you to bring petitioners here, there would be a
23  significant argument that their standing under the various
24  immigration statutes, under asylum law, that sort of thing, had
25  been inalterably changed such that they could be invested with a

                                      25
1  status that would not otherwise be available to either aliens
2  who had never entered the United States, or especially in kind
3  of the unique circumstances of this case, wartime detainees that
4  the executive is trying to find a place for resettlement.
5          THE COURT: Am I not correct that the Mariel boat
6  detainees are deemed never to have set foot in the United
7  States, even though they're locked up somewhere in Pennsylvania?
8          MR. HENRY: I'm not exactly sure about that, Your
9  Honor, quite frankly. I know that a lot of those individuals
10  for a number of years were held in prison.
11          Just as a practical matter, our position would be that
12  the conditions in Guantanamo Bay and Camp Iguana -- and let me
13  point out just a couple of facts on the side. Counsel are
14  permitted to meet with their detainees in Camp Iguana. There
15  are no security restraints during those meetings, they meet with
16  them in a rec hall.
17          And also there was a representation that somehow these
18  guys had entered their fifth year of detention, unless I
19  misheard. I'm not quite sure how that's possible, since the war
20  in Afghanistan didn't start until late in 2001. I believe

21  these individuals --
22      THE COURT:  Well, it's late in 2005.  That's four years
23  ago.  Entering the fifth year means finished four, starting the
24  fifth.
25      MR. HENRY:  I think these individuals were captured in

26

1   2002.
2       But in any event, again the Mariel boat people, I don't
3   have a specific answer on that.  I can certainly find out.  But
4   I know for a number of years those folks were kept in a
5   penitentiary, and we believe that the conditions in Camp Iguana
6   are much better.
7       And again, we are -- the government is serious about
8   finding a place for resettlement of these petitioners.  Its
9   diplomatic efforts are ongoing, and we're happy to report those
10  to the Court whenever you would like to hear them.
11      But in the meantime, for the reasons that we've argued
12  in our brief, based on the Shaughnessy case, we don't believe
13  the Court has the power to bring the petitioners here.  And even
14  if the Court did have the power, I think if you look at the
15  factors in the Mapp case, there's not a good reason to exercise
16  your power to do it, and lots of reasons not to.
17      If I could just comment, in closing, on a couple of
18  points.  As far as the legal authority that the petitioners
19  cite, they refer to footnote 15 in the Rassoul case, they refer
20  to kind of these common law rights to be released, that sort of
21  thing.  I just point out that all of those are involved in the
22  Court of Appeals case, and so hopefully sometime soon we'll get
23  a decision from the Court of Appeals on that.  I had hoped to
24  have it sooner rather than later, but given that the
25  government's diplomatic efforts are serious and ongoing, and for

27

1   all the reasons I've talked about, I don't believe that it would
2   be appropriate for Your Honor to order that the petitioners be
3   brought here.
4       THE COURT:  What about alternative three?
5       MR. HENRY:  Alternative three would be to --
6       THE COURT:  Order you to release them.
7       MR. HENRY:  Well, Your Honor, I guess that presents a
8   number of problems.  You order us to release them; we certainly
9   are not at liberty to release them to a foreign sovereign that
10  has not agreed to take them.  Again, we think there's serious
11  problems with the Court ordering that they be released into the
12  United States, so --

13      THE COURT: I didn't say into the United States, I said
14  release them, hypothetically.
15      MR. HENRY: Well, Your Honor, I'm having problems
16  thinking of other options. I suppose they could release them on
17  Guantanamo Bay, but that presents its own problems that were
18  addressed, I believe, in our prior filings as far as security
19  both of the detainees themselves and other security issues,
20  since Guantanamo Bay is a military reservation.
21      So as Your Honor pointed out, the authority that we
22  claim to continue to hold these individuals in a Camp Iguana
23  type affair is the authority to wind up these detentions as
24  quickly as possible in an orderly fashion. The Court's order to
25  release them potentially could, I suppose, throw that into

28
1  somewhat of a disarray.
2      But I'm really not sure what else could be done; the
3  option of releasing them on a military base is not a good one,
4  we can't get them to a foreign sovereign, certainly the
5  executive is highly unlikely to admit them to the United States
6  of its own accord. And so again, it presents some serious
7  problems which I think counsel that the case, as far as those
8  kind of proceedings, continue to be stayed until we get some
9  guidance from the Court of Appeals or we find a place to
10  resettle them, given that the efforts are serious and ongoing.
11      THE COURT: All right, sir. Thank you. Mr. Willett,
12  anything further?
13      MR. WILLETT: Yes, sir. A couple of points in
14  response. According to Mr. Qassim, he was taken into custody by
15  U.S. forces in Pakistan on December 11, 2001.
16      While Mr. Henry was speaking, I leafed through to
17  Justice Kennedy's concurring opinion in Rassoul. Everybody
18  talks about whether or not you can bring them here, as though
19  they're not already here, here in the United States. Justice
20  Kennedy says, first, "Guantanamo Bay is in every practical
21  respect a United States territory." He goes on, "From a
22  practical perspective, the indefinite lease of Guantanamo Bay
23  has produced a place that belongs to the United States,
24  extending the implied protection of the United States."
25      So that is, I think, authority for the proposition that

29
1  they're already here in the law. I don't know why Your Honor
2  couldn't fashion an order that says your order shall not be
3  deemed an entry to the extent one hasn't been made already, and
4  people may fight about what that means one day.

5          Mezei, the Shaughnessy case, is one that Zadvadus
6   distinguishes because he was a guy who had come here voluntarily
7   to Ellis Island.  I apologize, I don't have the cite, but
8   there's an interesting book, and I'll try to find the cite about
9   that case, and it is speculated that somebody simply opened the
10  door, because he disappeared from Ellis Island.  The case
11  ultimately was dismissed, and presumably he's here, his children
12  are alive and well in the United States today.  I think there
13  was a movie like that not so long ago.
14          THE COURT:  That guy was in the airplane terminal,
15  wasn't he?
16          MR. WILLETT:  In the airport they tried to open the
17  door and he wouldn't do it.
18          The point is here that these guys were brought to
19  Guantanamo, they didn't volunteer, so we say they're here.
20  They're in what Justice Kennedy says is in every practical way
21  the United States.  And then when you go through the little baby
22  steps, I don't think we're asking for very much to get from that
23  to this interim release.
24          Thank you.
25          THE COURT:  All right, counsel.  You've done your best.

                                   30
1   I can't pretend to be pleased at having learned a whole lot that
2   I didn't know when I came in here, but counsel have done their
3   best with what I think is really classically a dilemma.
4          The one thing that I am sure of is that I'm going to
5   act on this motion within the next week or two one way or
6   another.  There isn't going to be any more waiting.  So if
7   anybody has anything to say to me by way of augmenting the
8   record -- I don't -- thank you, Mr. Henry, for your offer to
9   speak to me off the record, but I don't want that.  I'm just not
10  going to be in that position.  If you can tell me that they're
11  going to be released on X date, you can tell me that publicly.
12  Or if you can tell me that they're going to be released on X
13  date and you have a date, I'll accept that.  But "diplomatic
14  efforts are proceeding," no thank you.
15          Within two weeks, at the most, I'm going to act on this
16  motion.  So the matter is submitted, unless anybody has anything
17  else to submit either orally today or in writing in the next
18  week or 10 days.  Thank you very much.  We're adjourned.
19
20
21
22
23

24
25

31

1    CERTIFICATE OF OFFICIAL COURT REPORTER
2
3        I, Rebecca King, certify that the foregoing is a
4    correct transcript from the record of proceedings in the
5    above-entitled matter.
6
7
8
9    _____    _____
10   SIGNATURE OF COURT REPORTER          DATE
11
12
13
14
15
16